## CARE AND PROTECTION OF LILLITH.[1]

No. 03-P-1280.

Middlesex. February 3, 2004. - May 4, 2004.

Present: GREENBERG, GRASSO, & KAFKER, JJ.

*Parent and Child,* Care and protection of minor, Custody. *Minor,* Custody. *Abuse Prevention.*

In a care and protection proceeding, the Juvenile Court judge's findings of fact and conclusions of law, for which there was record support, clearly and convincingly established the mother's unfitness to parent her child. [134-136]

In a care and protection proceeding, the Juvenile Court judge's failure to make detailed and comprehensive findings regarding domestic violence that the child's father purportedly had inflicted upon the child's mother warranted remanding the case for clarification of the judge's findings on domestic violence, its effect on the child, and its relationship to the father's ability to parent. [139-142]

PETITION filed in the Lowell Division of the Juvenile Court Department on December 20, 2000.

The case was heard by *Terry M. Craven,* J.

*Pauline Quirion* for the mother.

*Lisa J. Campbell* for the child.

*Brian Pariser* for Department of Social Services.

*Toni G. Wolfman & Lucy Fowler,* for Massachusetts Citizens for Children & others, amici curiae, submitted a brief.

KAFKER, J. The mother and child appeal from a judgment of the Juvenile Court, pursuant to G. L. c. 119, § 26, finding the mother unfit and awarding permanent custody of the child to the biological father, who had been accused of domestic violence. The mother and child contend that there is not clear and convincing evidence of the mother's current unfitness.

---

[1] A pseudonym.

Further, they argue that public policy considerations support the application of *Custody of Vaughn*, 422 Mass. 590 (1996), to care and protection cases and that the judge's failure to make specific and detailed findings on domestic violence by the father consistent with *Vaughn* constitutes reversible error. See *id.* at 599-600. Finally, they contend that the judge erred in granting permanent custody to the father under G. L. c. 119, § 26. We affirm the judge's ultimate finding as to the mother's current unfitness, but remand the case for express and detailed findings regarding domestic violence and its effect on the child and the father's fitness to parent. We also conclude that, in this care and protection proceeding in which the mother has been determined to be unfit, custody belongs to the biological father if he is not unfit, a question that remains to be resolved on remand.

1. *The Department of Social Services' involvement with the family.* The mother and father met in 1991. They lived together for a few years, without marrying, before the child was born on March 13, 1994. Following the parents' separation in February, 1996, the child lived with the mother.

After a G. L. c. 119, § 51A, report was filed and supported in October, 2000, and the mother was evicted from her home in December, the Department of Social Services (department) filed a care and protection petition on December 20, 2000, pursuant to G. L. c. 119, § 24. Temporary custody of the child was granted to her paternal aunt at the initial custody hearing. The judge then returned custody to the mother on March 26, 2001, with the conditions that she remain drug free, submit urine screens to the department, and complete a psychopharmacological evaluation and a neurological exam.

Another G. L. c. 119, § 51A, report was filed on May 18, 2001, when the child told school officials that there had been a fight in the apartment where the mother and child resided with two other adults and two other children. That report was supported. In June, the mother and child left that apartment and moved to New Hampshire, without notifying the department. As a consequence, the judge returned the child to the temporary custody of the department on July 11, 2001.

The father located the mother and child in New Hampshire and returned with the child to Massachusetts, where he sur-

rendered her to the department. The child was placed with family members for a short time and then placed in a foster home by the department. Following a hearing in November, 2001, temporary custody remained with the department. On March 6, 2002, upon the father's request, he was adjudicated the child's father based upon the results of paternity testing. On June 21, 2002, the department placed the child with the father in Nashua, New Hampshire, where he lived with his fiancée and her teenage daughter.[2] The child has since resided with her father. A hearing on the merits concluded in September, 2002; judgment entered on December 19, 2002; and written findings were issued on July 21, 2003. Based on the record before this court, it does not appear that the mother has sought a review and redetermination hearing as to her parental fitness. The mother and child have, however, appealed the underlying judgment.

2. *The mother's parental unfitness.* The Juvenile Court judge's findings of fact and conclusions of law, for which there is record support, establish the mother's unfitness clearly and convincingly. See *Custody of Eleanor*, 414 Mass. 795, 799 (1993). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, mental stability, home environment, and capacity to provide for the child in the same context with the child's particular needs, affections and age." *Adoption of Mary*, 414 Mass. 705, 711 (1993). "[W]e require that the judge's findings be specific and detailed, so as to demonstrate that close attention was given to the evidence." *Adoption of Georgia*, 433 Mass. 62, 66 (2000).

The judge's findings here relate primarily to the mother's delusions of parasites, drug dependency, inability to comply with department service plans, and nomadic lifestyle, and to how the mother's behavior affected the child. The judge found that the mother "exhibited symptoms of paranoia and delusional thinking; believing that her apartment, as well as herself, were infested with parasites." During the course of a visit by a department social worker, the mother collected "specimens" that she

---

[2]According to counsel for the department, and as found by the trial judge, the State of New Hampshire conducted a home visit and evaluation as required by St. 1963, c. 452, § 1, art. III(d), and recommended that the child be placed with the father. Compare *Adoption of William*, 433 Mass. 636, 644 (2001).

asserted were insects: these specimens were in fact a clump of chocolate drink mix, a "marble size nut," and a piece of tomato. The child also told the social worker that she would use tweezers to pull out the bugs from her mother's back. Neither the board of health nor an exterminator hired by the landlord found any evidence of infestation in the apartment.[3]

A dermatologist diagnosed the mother with "pickers nodules," a condition that occurs when an individual consistently picks at her skin, causing the skin to harden into nodes or nodules. Another dermatologist and the mother's primary care physician believed that the mother suffered from delusions of parasitosis.

The judge found that the "[m]other would not send [the child] to school due to her belief that [the child] was infested with bugs despite medical evidence to the contrary." While in her mother's custody, the child "missed [thirty-nine] out of 175 days of kindergarten. She missed [eighteen] out of [the first twenty-eight] days of first grade and did not attend [school] at all from October 2, 2000, to . . . December 20, 2000."[4] The child was ultimately expelled due "to excessive absenteeism." The judge concluded that the "[m]other's mental health issues were the direct cause of [the child's] lack of attendance in school" and that the mother was unable "to understand the effect of excessive school absenteeism on her child."

The judge also found, with substantial support in the record, that the mother was addicted to Vicodin and abused Valium. As a condition of retaining custody of the child in March, 2001, the mother was required to remain drug free and to submit urine screens to the department for analysis. The mother failed to provide any drug screens to the department as requested, but provided one result to the court. The judge's findings further detailed the mother's general inability to comply with department service plans, especially those "developed to have [the] mother address her mental health issues and her neglect" of the child.

---

[3]The only confirmed incidence of parasites related to head lice found on the child in the fall of 2000.

[4]The mother told the department that she was "home-schooling" her child, but the judge found that she "has not been certified to home school her daughter."

Finally, the judge focused on the mother's frequent moves with the child. While the child was in her mother's physical custody, from November, 2000, to July, 2001, the pair resided in at least four different locations: their home from which they were evicted; a motel; a friend's apartment, where they slept on the living room couch and floor; and finally a trailer park and campground in New Hampshire, where they moved without notifying the department.[5] The judge, while acknowledging that just prior to trial the mother had obtained appropriate housing, was not obliged to give undue weight to that evidence. See *Adoption of Lorna*, 46 Mass. App. Ct. 134, 143 (1999); *Adoption of Inez*, 428 Mass. 717, 723 (1999).

The evidence before the judge, reflected in the judge's ninety-one findings of fact and seventeen conclusions of law, establish the mother's parental unfitness clearly and convincingly.[6]

3. *The father's parental fitness.* (a) *Findings and record evidence.* The judge found that the father was able "to provide [the child] with a stable and nurturing environment in which to grow"[7] once the child was placed with him; the father used the "services offered . . . by the [d]epartment in an effective manner"[8]; and he was "in compliance with all the tasks on his service plans with the [d]epartment."[9] The child "attend[ed] public school on a regular basis" when she began living with

---

[5]The mother and child correctly contest the judge's finding that the "mother lived in *nine* different locations over a two year period" (emphasis added).

[6]The factual errors that the judge did make (see, e.g., note 5, *supra*) were insignificant given the extensive evidence concerning the mother's unfitness. See *Adoption of Helen*, 429 Mass. 856, 859-861 (1999) (minor errors do not matter where ultimate conclusion of unfitness is thoroughly supported by record); *Adoption of Peggy*, 436 Mass. 690, 702 (2002) (marginal errors harmless).

In this regard, we also note that the judge referenced the G. L. c. 210, § 3, factors in her decision. This was inappropriate in a care and protection proceeding, but was harmless. Cf. *Petition of the Catholic Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 662 (1984), *S.C.*, 395 Mass. 180 (1985).

[7]The father lives in a three-bedroom home with his fiancée and her daughter, who assist him in caring for the child.

[8]The father completed a single-father parenting class and attended family therapy sessions as suggested by the department.

[9]These services do not appear to have been directed at domestic violence or anger management.

the father. The father was supportive of the mother's visitation rights.

The judge also found that the father admitted to a history of substance abuse for which he had sought treatment. He "remained sober for [four] years" following treatment, relapsed when he was diagnosed with cancer, but "is now sober."

The judge's findings and conclusions on domestic violence are, however, ambiguous, essentially just summarizing conflicting testimony: "Father testified that he did injure Mother in 1996 with his car. He was leaving for Florida in his car when Mother ran to the car and tore off the license plate, as he backed up and 'planted her in a snowbank.' Father stated that 'he was unaware that she was behind the car at the time.' Father turned himself into police when he found out they were looking for him. He pleaded guilty to assault and battery with a dangerous weapon and served 30 days in jail."

The judge recited the mother's testimony as well, which described a more violent February, 1996, incident. Although she recounted somewhat different and inconsistent versions of that incident at trial, the mother described the father smashing her head against a windshield and fracturing her skull prior to her leaving the car and the father backing into her.[10] The mother testified that the child witnessed this incident from her car seat and that the father threatened to kill the mother and the child. The mother also testified that she sought medical care after the incident.[11] The judge did not resolve the credibility dispute between the mother and father's different versions of the February, 1996, incident or address the father's guilty plea.

In regard to other incidents of domestic violence, the mother and father acknowledged that their relationship was acrimonious.

---

[10] In one version, she also reported that the father dragged her down the stairs of their home.

[11] The record does not contain any hospital or medical records to corroborate the mother's assertion that she sought treatment for her head injuries. The mother's primary care physician was interviewed by a Juvenile Court clinician and reported that, in 1999, the mother had been "diagnosed with 'seizures and a history of severe head trauma.' " The father told the court clinician that the mother's head injuries resulted from a "car accident in her twenties [when] . . . she went through the windshield and fractured her skull." The mother contends that the department failed to follow up on its own investigator's suggestion that additional medical records be pursued.

The father told a court clinician that "at times — we were both hitting each other," but asserted that the abuse stopped when the child was born in 1994. The mother testified that they "fought quite often" and that the father would strike her "quite often." She told a court clinician that the abuse continued after the child's birth. Included in the findings was the mother's statement that, "although [the] father has a history of abusing her, he never abused [the child] and [the] 'things he did never put [the child] at risk.' "

There was also evidence of other injuries to the mother that the judge did not address. A court clinician's report included excerpts from the mother's medical records. The clinician summarized the mother's primary care physician's records as follows: "On 7/5/95 [after the birth of the child], [the mother] presented with a 'large hematoma and bruise around the left face. Black eye — bruising around left mandible. Bruise on both arms — two on left. Beaten by boyfriend on 7/3/95." Although they were living together at the time, the evidence does not specifically indicate whether the father was the boyfriend referenced in the physician's record.

The father responded to questions about his criminal history on direct and cross-examination. His criminal record, which was admitted in evidence, shows that, though he was charged with domestic assault and battery in September, 1995, that charge was later dismissed.[12] Since the 1995 and 1996 charges, the record reveals no evidence of domestic abuse on the part of the father; the judge, however, made no findings to that effect.[13] Likewise, the father's ex-wife, not the mother in this case, told a court investigator that the father was not physically abusive to her or her children. Similarly, the judge did not address that statement in her findings. There are no findings on the effects of

---

[12]The father was also charged with rape in 1979 when he was eighteen years old, for which he apparently received approximately three years' probation.

[13]The parties dispute the significance of the father's demeanor and statements during trial. The mother argues that they are "reflective of a volatile personality." In response to questions concerning his health, the father told opposing counsel, "I could take you down in a second." Although the judge made no findings in this regard, the hearing transcript is filled with reminders that the father needed to settle down.

domestic violence on the child. The record is slim to bare on the subject. We note that a court investigator's report dated July, 2002, states that the child's "personality testing found indications of a child that 'was angry and depressed.' 'Anger, worry and depression' were common emotions as well as physical violence, physical injury and abandonment."

(b) *Application of* Custody of Vaughn *to care and protection proceedings.* In *Custody of Vaughn,* 422 Mass. at 595, the court declared that "physical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm." The court emphasized that the "very frequency of domestic violence in disputes about child custody may have the effect of inuring courts to it." *Id.* at 599. The court, therefore, reversed a decision by a Probate Court judge to award custody to a "father who had committed acts of violence against the mother," *id.* at 596, because the judge had "failed to make detailed and comprehensive findings of fact on the issues of domestic violence and its effect upon the child as well as upon the father's parenting ability." *Id.* at 599, quoting from *R.H.* v. *B.F.,* 39 Mass. App. Ct. 29, 40 (1995). Domestic violence, the court declared, "is an issue too fundamental and frequently recurring to be dealt with only by implication." *Custody of Vaughn, supra.*

The parties are in agreement that the principle established in *Custody of Vaughn, supra,* that judges should make detailed and comprehensive findings on domestic violence when making custody determinations, applies in proceedings pursuant to G. L. c. 119 and G. L. c. 210.[14] Counsel for the child and mother also focused the Juvenile Court judge's attention on *Custody of Vaughn* during trial and in closing arguments. The department argues, however, that the judge did not err in this case because there was a lack of credible evidence of domestic violence to require such findings. We disagree. Here, the record raises sufficient concerns regarding domestic violence to require *Vaughn* findings. *Id.* at 599-600.

We recognize that the record on domestic violence is difficult

---

[14]*Custody of Vaughn* involved a custody proceeding in the Probate Court pursuant to G. L. c. 209C and G. L. c. 208, § 31.

to evaluate because the incidents are dated and in part disputed: the acts of domestic violence occurred at least six years before the trial. The record contains no reported incidents of domestic violence on the part of the father since that time. Although he has had only limited contact with the mother, the father has had custody of the child since June, 2002.

The undisputed evidence, however, established that the father backed his car into the mother in February, 1996, and that he admitted to sufficient facts on charges of assault and battery with a dangerous weapon. He was found guilty of that offense and received a sentence of thirty days. This in and of itself warranted careful consideration of the issue of domestic violence in relation to the custody decision.[15] In addition, the mother contended that, in that same incident, the father smashed her head into the windshield in the presence of the child. In one version of these events, she also contended that the father

---

[15]Although G. L. c. 119 has not been similarly amended, the Legislature, in G. L. c. 208, § 31A; G. L. c. 209, § 38; and G. L. c. 209C, § 10(*e*), has created the following rebuttable presumption:

"In issuing any temporary or permanent custody order, the probate and family court shall consider evidence of past or present abuse toward a parent or child as a factor contrary to the best interest of the child. . . . [A]buse shall mean the occurrence of one or more of the following acts between a parent and the other parent or between a parent and child: (a) attempting to cause or causing serious bodily injury; or (b) placing another in reasonable fear of imminent bodily injury. 'Serious incident of abuse' shall mean the occurrence of one or more of the following acts between a parent and another parent or between a parent and child: (a) attempting to cause or causing serious bodily injury; (b) placing another in reasonable fear of imminent bodily injury; or (c) causing another to engage involuntarily in sexual relations by force, threat or duress.

"A probate and family court's finding by preponderance of the evidence, that a pattern or serious incident of abuse has occurred, shall create a rebuttable presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody, or shared physical custody with the abusive parent. Such presumption may be rebutted by a preponderance of the evidence that such custody award is in the best interests of the child."

threatened to kill her and the child.[16] The judge summarized the different versions, but did not assess the credibility of the witnesses. See *Custody of Vaughn*, 422 Mass. at 597-598 (stating "[t]he judge did not, however, make any findings of fact based on [the expert's] testimony and did not say whether he considered [the expert's] testimony credible"). See also *R.H.* v. *B.F.*, 39 Mass. App. Ct. at 40 ("[a]lthough the trial judge recited much of the testimony of the mother, her older son, the daughter and the psychologist, he made no findings of fact on that testimony"). If the mother's version were credited, a deliberate act of domestic violence, causing a serious injury, had taken place in front of the child, who was just shy of two years old. See generally *Custody of Vaughn*, *supra* at 599 (acknowledging reports of "psychological problems in children who witness domestic violence, especially during important developmental stages"); *Adoption of Ramon*, 41 Mass. App. Ct. 709, 714 (1996) (relying on *Custody of Vaughn* and addressing effects of domestic violence on a one and one-half year old child).

As noted above, the mother's medical records also reveal that she was badly "beaten by [her] boyfriend" in July, 1995, when she was apparently involved with the father, a little more than a year after the child was born. The judge did not address this issue in her findings. Also unresolved is the extent to which domestic violence occurred in front of the child, or if the child heard such violence. The father denied that any domestic violence occurred in the presence of the child. The judge's findings are that the mother testified that "although [the] father had a history of abusing her [including after the birth of the child], he never abused [the child] and [the] 'things he did never put [the child] at risk.' " *Vaughn* cautions, however, that witnessing domestic violence is itself a "grievous" harm. *Id.* at 595. See generally Cahn, Civil Images of Battered Women: The Impact of Domestic Violence on Custody Decisions, 44 Vand. L. Rev. 1041, 1055 (1991).

The judge was within her authority to credit the father's or the mother's versions of events, in whole or part, over the other. See *Custody of Two Minors*, 396 Mass. 610, 618 (1986) ("the

---

[16]The father denied everything but backing his car into the mother, without being aware of her presence, and "plant[ing]" her unharmed in a snowbank.

judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference"). None of the judge's findings of fact or conclusions of law, however, evaluate or resolve the credibility of the witnesses' accounts of the events of 1995 and 1996, which present different depictions of the father's domestic violence and the child's exposure to it. Nor do the findings address the "the effects of domestic violence on the child and the appropriateness of the . . . custody award in light of those effects." *Custody of Vaughn, supra* at 600.

The department argues that the judge has discredited the mother's testimony. It could also be argued that the judge considered the evidence of domestic violence to be stale and not reflective of present circumstances or positive gains by the father. See, e.g., *Adoption of Paula,* 420 Mass. 716, 731 (1995); *Adoption of George,* 27 Mass. App. Ct. 265, 268 (1989). The judge did refer to the father's general change of circumstances through his use of the department's services, including parenting classes and counseling. There is, however, nothing explicit about the judge's consideration of domestic violence.

In sum, although the evidence of domestic violence in this case may be dated, and in part disputed, it was sufficient to require the express consideration of the issue as set forth in *Custody of Vaughn.* Because the issue cannot be decided by implication, we remand the case for clarification of the judge's findings on domestic violence, its effects on the child, and its relationship to the father's ability to parent. See *Custody of Vaughn, supra* at 600; *Maalouf* v. *Saliba,* 54 Mass. App. Ct. 547, 549, 551 (2002) (remand of an order granting father visitation for findings consistent with *Custody of Vaughn* as codified in statutory directive of G. L. c. 208, § 31A, requiring judges to "consider evidence of past or present abuse . . . as a factor contrary to the best interest of the child"). As did the court in *Custody of Vaughn, supra,* "[w]e do not by this decision require the judge to hear further testimony if [she] does not consider this necessary, but at the least [she] must hear both parties and make explicit findings on the matters set out above."

4. *Award of permanent custody to the father.* The mother and child also contend that the judge exceeded her authority when she awarded "permanent custody" to the father pursuant to

G. L. c. 119, § 26.[17] We need not resolve this question as we have remanded the case for more complete findings on the father's fitness, given the past incidents of domestic violence. We point out, however, that paternity has been conclusively established through court-ordered paternity testing and that the mother has been determined to be unfit. In these circumstances, "[i]n a care and protection proceeding, custody belongs to a parent such as [the father] if he is not unfit." *Care & Protection of Zelda*, 26 Mass. App. Ct. 869, 871 (1989) (mother unfit and father acknowledged paternity in G. L. c. 119, § 24, proceeding in the Juvenile Court).

Accordingly, the judgment declaring the mother unfit is affirmed. The award of permanent custody to the father is vacated, and the case is remanded for further proceedings in accordance with this opinion. Pending those proceedings, temporary custody is to remain with the father.

*So ordered.*

---

[17]There is no challenge to the Juvenile Court judge's ability to award temporary custody to the father pending the determination of whether the father is fit to parent.