The mother appeals from a decree issued by a judge of the Juvenile Court pursuant to G. L. c. 210, § 3, dispensing with the need for her consent to the adoption of her daughter Winnie. Generally, the mother argues that the judge erred in terminating her parental rights on the basis of stale evidence, without any indication that she actually abused or neglected Winnie, who was only two days old when she was removed from the mother's care and custody. We discern no abuse of discretion or error of law in the judge's determination that the mother was unfit and that the best interests of Winnie would be served by terminating the mother's parental rights, and we accordingly affirm the decree.
Background. We summarize the judge's detailed and comprehensive findings of fact. The mother had a history of behavioral problems and housing instability dating back to her childhood, when she was removed from the home of her mother (the grandmother) due to the grandmother's substance abuse. As a young girl, the mother was diagnosed with depression and bipolar disorder, and was hospitalized three times due to mental health issues. Though she was prescribed medication, she ceased taking it while still an adolescent. Her criminal history also began as a juvenile, with charges of disorderly conduct and threats. She was placed in various foster homes but repeatedly ran away.
While still in foster care at the age of seventeen, the mother gave birth to her first child, Emma (a pseudonym), in January, 2009. The mother was placed in a specialized foster home with Emma; there she violated house rules, breaking curfew and going missing. On at least one occasion, she left Emma in the grandmother's care, despite the grandmother's known drug abuse. On another occasion, the mother ran away to her sister's home, where the two had a violent dispute in front of Emma, during which the mother wielded a knife. When staff of the Department of Children and Families (department) later came to remove Emma from the mother's custody, the mother threatened to kill, and physically attacked, them.
The mother was charged with additional crimes, convicted and placed on probation; she also violated probation and was incarcerated. In July, 2011, she was sentenced to eighteen months' imprisonment, and consented to the termination of her parental rights and the adoption of Emma, who was fifteen months old at the time.
In 2013, after being assaulted by a boy friend, the mother went to live in a shelter. In September of that year, she learned that she was pregnant again, so she left the shelter and moved in with the man she believed to be the baby's father.[3] There was violence in that relationship as well and, after learning that the man was married, the mother moved to the grandmother's home. She left that home because the grandmother smoked "crack" cocaine in the house, and next went to her sister's home. After another violent fight with her sister, she moved to a shelter, eventually finding her way back to the grandmother's home late in the pregnancy.
The mother gave birth to Winnie in April, 2014. The following day, a mandated reporter filed a report, pursuant to G. L. c. 119, § 51A, alleging neglect of Winnie by the mother; the issues included unstable housing, mental health concerns, domestic violence during pregnancy, and the mother's positive test for THC (marijuana) in the ninth month of pregnancy. Investigation by the department revealed that the mother did not plan to go to a shelter after leaving the hospital, but instead intended to go to the grandmother's house. The department filed a care and protection petition, pursuant G. L. c. 119, § 24, on behalf of Winnie the following day and obtained custody. Winnie was placed in a foster home when she was two days old.
While the case was pending, the department developed a series of service plans for the mother with the goal of reunification of the mother with Winnie. With the exception of the completion of a parenting course, the mother failed to achieve any of the service plan tasks. Her employment was minimal and unstable, and she was unemployed at the time of trial. She failed to pursue mental health treatment meaningfully, attending only four sessions in the spring of 2015; of note, she consistently denied that she needed any such treatment. She also failed to secure stable housing, remaining homeless and staying from "place to place," including, on multiple occasions, at the grandmother's home.
Additionally, while the case was pending, the mother continued to exhibit concerning behaviors. For example, in order to test whether the man she believed to be Winnie's father cared for Winnie, the mother told the man's mother that Winnie had died. The mother was also on probation when Winnie was born, yet she violated the terms of that probation by smoking marijuana and by refusing to seek mental health services. Although some of the mother's earlier visits with Winnie went well, she ceased visiting altogether after Winnie's first birthday party in May, 2015, and had not seen her at all for the ten months prior to the March, 2016, trial.
After trial, the judge found the mother unfit, terminated her parental rights, and approved the department's plan of adoption by the foster parent, in whose care Winnie had been since two days after she was born.
Discussion. The mother's over-all contention is that the judge terminated her parental rights based on stale evidence.
A judge may only terminate parental rights if he determines, first, that the parent is unfit, and second, that termination would be in the best interests of the child. See Adoption of Nancy, 443 Mass. 512, 514-515 (2005). The judge must articulate specific and detailed findings, demonstrating that he has given the evidence close attention. Ibid. We review those findings with substantial deference, recognizing the judge's discretion to evaluate witness credibility and the evidence. Id. at 515. Subsidiary findings must be proven by a preponderance of the evidence and will not be disturbed unless clearly erroneous. Ibid. The critical finding of unfitness must be proven by clear and convincing evidence. See ibid.
We review each of the mother's contentions to discern any abuse of discretion or clear error of law on the part of the trial judge. See Adoption of Ilona, 459 Mass. 53, 59 (2011).
1. Parental unfitness. (a.) Housing instability. The mother claims as error the judge's finding that she was unable to provide stable housing for Winnie. While a family's homelessness, alone, does not justify removal of a child, see Adoption of Linus, 73 Mass. App. Ct. 815, 821 (2009), a pattern of acute housing instability and frequent relocation is appropriately considered. See Care & Protection of Lilith, 61 Mass. App. Ct. 132, 136 (2004). Here, there was ample evidence of the mother's chronic housing instability. She had been homeless for two years by the time of trial, seeking shelter at times with the grandmother, an active drug user, and her sister, with whom she had had violent altercations. Although she had obtained shelter placements on two occasions, she left them voluntarily.
Despite the record evidence on this issue, the mother contends that the judge was unduly swayed by an erroneous perception that she had refused to enter a shelter upon Winnie's birth, in favor of returning to the grandmother's home. In his findings, the judge stated that the mother told the department that she did not want to enter a shelter, when, in fact, the mother made this statement to a social worker at the hospital; it was this social worker who reported this conversation to the department. Although the mother characterizes this as hearsay, it was properly relied on for its substance. See Adoption of George, 27 Mass. App. Ct. 265, 273-275 (1989) (statement of primary fact made to person with duty to report, recorded in government record, admissible). The misattribution of the source of the information is therefore of no consequence.
(b.) The mother's first child. The mother contends that the judge erred in using the fact that her first child, Emma, had been removed from her care as predictive of her ability to parent Winnie. It is well established that a court may look to past conduct as it may bear on future conduct. See Custody of a Minor (No. 2), 378 Mass. 712, 714 (1979) (State's interest in protecting children may be preventive, not only remedial); Adoption of Diane, 400 Mass. 196, 204 (1987) (prior patterns of conduct may bear on present unfitness).
Here, there were many similarities between the mother's past behavior with respect to Emma and that she displayed during the proceedings involving Winnie. Most notably, the mother expressed an intention to take Winnie to the grandmother's home, as she did with Emma. The risk posed by the grandmother's active drug use remained unabated. The mother also continued to engage in criminal activity. With Emma, the mother's criminal activity resulted in an eighteen-month sentence, termination of her parental rights, and the child's adoption. Similarly, while pregnant with Winnie, the mother violated her probation, making her vulnerable to incarceration. Additionally, as with Emma, the mother ceased visiting Winnie altogether. There was no error in viewing the mother's prior conduct as predictive of future behavior.
(c.) The mother's mental health, substance abuse, domestic violence, and criminal record. The mother claims error in the judge's consideration of "stale" facts with respect to the mother's mental health, substance abuse, domestic violence, and criminal record. Although the judge recited facts going back to the mother's youth, her problems in these areas continued throughout her life, including up to the time of trial.
With respect to mental health, the mother was not only diagnosed with mental health issues and psychiatrically hospitalized early on, but she was required to engage in mental health counselling as a term of probation that she was on at the time of trial; she failed to comply with that condition.
As to substance abuse, the mother tested positive for THC in her ninth month of pregnancy with Winnie; at the time of trial, she was in violation status of her probation for failure to remain drug free, suggesting that she had not resolved her issues with substance abuse.
With regard to domestic violence, there was evidence, not only of violence between the mother and her sister, but also between the mother and several of her partners, throughout her pregnancy with Winnie.
As for the mother's criminal record, she had been convicted of a crime shortly before Winnie's birth. She was charged with additional offenses afterward, and as we have observed, she had violated various terms of her probation at the time of trial.
The evidence relied on by the judge was not stale, and he properly considered it as bearing on the mother's current fitness to parent Winnie.
(d.) The mother's failure to visit Winnie. The mother contends that the judge improperly faulted her for failing to visit Winnie after her first birthday party, because it was essentially the mother's poverty, beyond her control, that prevented her from doing so. Although the mother provided a variety of excuses for missing the visits, including a lack of funds to pay for travel expenses, failure to get time off from work, inability to contact the social worker, conflicting doctor's appointments, and family emergencies, the judge did not credit them. Recognizing the judge's discretion to evaluate witness credibility and weigh the evidence, we defer to his finding that the mother's excuses did not explain why she ceased visiting Winnie entirely. Adoption of Nancy, 443 Mass. at 515.
2. Best interests. Lastly, the mother argues that the judge erred in terminating her parental rights without sufficient evidence as to Winnie's best interests, as there was no evidence of her actual abuse or neglect of Winnie. The evidence clearly and convincingly established that termination of the mother's parental rights was in Winnie's best interests. Based on the mother's past conduct, leading up to trial, the judge concluded that the mother was likely to expose Winnie to housing instability, inappropriate and potentially dangerous substitute caregivers, domestic violence, and her potential incarceration due to criminal activity. See Adoption of Ilona, 459 Mass. at 59-60 (judge entitled to weigh evidence and determine whether parental unfitness is temporary or likely to continue). Therefore, there was no abuse of discretion or error of law in the judge's conclusion that Winnie's best interests would be served by terminating the mother's parental rights. See Adoption of Elena, 446 Mass. 24, 31-32 (2006).
Additionally, contrary to the mother's contention on appeal, the judge was not required to have expert evidence regarding the issue of bonding in order to terminate parental rights, as termination was based on factors other than Winnie's bond to her foster parents. Contrast Adoption of Rhona, 63 Mass. App. Ct. 117, 127 (2005) (expert testimony may be necessary where inability of parents to meet needs of children, resulting from separation from foster parents, was decisive factor in finding of unfitness).
Decree affirmed.

As to this man, a judgment of nonpaternity entered in the Probate and Family Court in November, 2014. Winnie's father is otherwise unknown.