NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

22-P-568                                          Appeals Court

ADOPTION OF LEONARD.[1]


No. 22-P-568.

Barnstable.      February 6, 2023. - September 26, 2023.

Present:  Henry, Shin, & Hodgens, JJ.


Adoption, Dispensing with parent's consent.  Minor, Adoption.
    Parent and Child, Dispensing with parent's consent to
    adoption.  Indian Child Welfare Act.  Evidence,
    Qualification of expert witness.  Witness, Expert.
    Practice, Civil, Adoption.  Department of Children &
    Families.


Petition filed in the Barnstable County/Town of Plymouth Division of the Juvenile Court Department on March 22, 2017.

The case was heard by James J. Torney, Jr., J.


Lois M. Farmer for the mother.
Richard A. Salcedo for Department of Children and Families.
Natalie K. Hoppel for the child.


HODGENS, J.  Following trial, a Juvenile Court judge

concluded that the mother was unfit and terminated her parental

---

[1] A pseudonym.

rights with respect to her son, Leonard, who is an enrolled member of the Mashpee Wampanoag tribe. See G. L. c. 119, § 26; G. L. c. 210, § 3. On appeal, the mother raises two primary arguments: (1) the evidence failed to support some of the judge's findings, and (2) the termination proceedings failed to comport with the requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901 et seq. While we conclude that the evidence supported the challenged findings, we vacate the decree and remand for further proceedings mandated by the ICWA.

Background. We summarize the facts found by the judge, supplemented by evidence from the record consistent with those findings. The mother struggles with mental health issues including bipolar disorder, posttraumatic stress disorder (PTSD), anxiety, and depression. Continuing through the time of trial, the mother has refused to take prescribed medications, has been "homeless her entire adult life," has "exhibited a pattern of leaving stable housing," and lives with family and friends, in the woods, or in her car. She also has "a limited employment history" and receives Social Security income. She has a criminal history that includes open cases of assault, assault on a family or household member, harassment, and breaking and entering with the intent to commit a felony.

The Department of Children and Families (department) became involved with the mother and the child (born in 2013) in 2014,

when it received a report pursuant to G. L. c. 119, § 51A (51A report), alleging neglect of the child. That report was unsubstantiated; however, the department substantiated four out of five 51A reports of suspected neglect filed from 2014 to 2016. The child was removed from the mother's care in March 2017, following an incident during which the mother became disruptive at a hospital while giving birth to her second child. Neither the mother's second child nor her third child, born during the course of these proceedings, is a party to this appeal.

A family action plan developed by the department outlined a number of tasks for the mother in order to work toward reunification with the child. The mother's mental health struggles impeded the child's healthy development and contributed to the mother's housing instability. The mother did not follow through with any of the tasks in the action plan apart from sporadic visits with the child. In particular, she did not avail herself of necessary mental health services, failed to communicate consistently with the department, and missed "numerous" visits with the child. On the occasions when she did visit, the mother "fail[ed] to demonstrate an understanding of [the child's] developmental level and needs." The department social worker assigned to the case attempted to assist the mother in filling out applications to access mental

health and housing services, but the mother often rebuffed her efforts.

The child has "special needs that . . . require active engagement by his caretaker." He is "delayed in the areas of adaptive and personal-social development." He is in therapy and has been diagnosed with PTSD, attention deficit hyperactivity disorder, and generalized anxiety and adjustment disorder. He also sees an occupational therapist "for concerns related to body awareness and personal boundaries as well as emotional regulation and attention and behavior issues." His behavioral issues include being aggressive toward his peers, being particularly aggressive toward females, using inappropriate language, and making sexual gestures.

Following his removal from the mother's custody in March 2017, the child was placed in multiple foster homes. Since August 2017, the child has been living in a tribal kinship foster home. The foster mother is a maternal second cousin. The foster mother enrolled him in a program that provides special needs services, arranged for corrective surgery related to a congenital abnormality, and cares for his physical, emotional, behavioral, and educational needs. Both the child and the foster mother are members of the Mashpee Wampanoag tribe, and the child attends an indigenous language immersion school as well as an after-school program. He is "comfortable

and thriving" in the foster mother's home and has "bonded to her."

Due to the mother's lack of progress with her action plan tasks, the department in July 2018 changed its goal from reunification with the mother to a permanent guardianship with the foster mother and sought termination of the mother's parental rights.  After a trial where the judge found the mother unfit and terminated her parental rights, the parties filed a joint motion to vacate the decree because the expert witness presented by the department failed to meet the requirements of the ICWA.  The judge allowed the motion.  Following a second trial that included forty-four exhibits and testimony from the mother, the department social worker, the foster mother, and a different expert witness on Native American cultures, the judge issued a decree terminating the mother's parental rights on November 8, 2021, and the mother appealed.

Discussion.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Xarina, 93 Mass. App. Ct. 800, 802 (2018), quoting Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  When, as here, a child is a member of an

Indian tribe, Federal law imposes additional requirements before parental rights may be terminated.  Two of those requirements are at issue here.  First, the judge must determine that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).  Second, the judge must make an additional "determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."  25 U.S.C. § 1912(f).  We do not disturb a judge's decision terminating parental rights unless the findings of fact are "clearly erroneous" or "there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. 53, 59 (2011).

Unfitness.  The mother contends that the judge erred by finding that she exhibited a "persistent lack of stable and appropriate housing" despite evidence showing that she had stable housing from March to September 2017.  We disagree.  The evidence clearly supported the judge's finding of the mother's persistent homelessness, which is a "proper consideration[] in an unfitness determination," when coupled with the mother's refusal to avail herself of available housing.  Adoption of

Virgil, 93 Mass. App. Ct. 298, 303 (2018). By her own admission at trial, the mother had been homeless "all [her] life before and after [she] had kids." She testified that she "stay[s] with friends and family, sometimes in [her] vehicle." The record also showed that the mother had a history of abandoning housing arrangements: in the summer of 2016, she abandoned housing in a New Bedford shelter; in September 2017, she abandoned tribe-provided housing on Cape Cod; in December 2017, she abandoned housing in a shelter in Springfield; and in June 2019, she abandoned housing in Chatham. The mother also testified that she did not have a place to live if the child were returned to her custody. In assessing the mother's fitness, the judge properly considered this evidence of the mother's history of abandoning housing and was not required to give "undue weight" to a fleeting period of housing stability. Care & Protection of Lillith, 61 Mass. App. Ct. 132, 136 (2004). See Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008) ("inability to secure 'adequate stable housing'" properly considered [citation omitted]).

We also discern no error in the judge's finding that the mother's untreated mental health issues endangered the child. The mother contends there was no nexus between her mental health issues and her ability to parent, but the record shows otherwise. The mental health issues cannot be viewed in

isolation. As the judge found, "persistent lack of stable and appropriate housing, untreated mental health issues, and limited insight into [the child's] needs" coalesced to endanger the child. The record showed that the mother had mental health issues including bipolar disorder, PTSD, anxiety, and depression, but refused to take prescribed medications. On March 22, 2017, the incident occurred resulting in the mother losing custody of the child. While in active labor with her second child, the mother came to the hospital with the child and became disruptive. The mother argued with hospital staff and threatened to leave against medical advice. Based on this incident, the department supported allegations of neglect against the mother due to, untreated mental health issues. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 617 (2021) ("judge reasonably concluded that the mother's failure to address her mental health concerns properly perpetuated the issues that brought the child into the department's custody").

Relying on Care & Protection of Bruce, 44 Mass. App. Ct. 758, 764 (1998), the mother contends that the department's service plan amounted to the heavy-handed ultimatum, "no medication, no child." To the contrary, the department presented a comprehensive action plan that included specific tasks tailored to the mother's mental health issues: submitting to a "full scale" psychological evaluation, signing releases for

the department's access to psychological records, engaging in mental health treatment, taking all prescribed medications, and notifying the department of her medications. According to the testimony of the department social worker, the mother failed to complete any of the tasks and remained "emotionally unstable." The social worker also testified that the Department of Mental Health had "offered [the mother] a bed," but she declined.

These untreated mental health issues also hindered the mother's ability to address the needs of the child. "When assessing parental fitness, it is not enough to state that a parent is mentally impaired, rather there must be a showing that the condition affects the parent's ability to care for the child." Adoption of Quentin, 424 Mass. 882, 888 (1997). According to the department social worker's testimony, the child had special needs, including "diagnosed disorders" of his own, that required a "stable" parent to be actively engaged in his psychological, emotional, and educational care. That social worker, with five years of experience in working with this family, testified that the mother "has not obtained or followed through in terms of getting any kind of stability in her life." Although the judge could have elaborated further, we conclude that he properly considered the nexus between the mother's untreated mental health issues and her "capacity to assume parental responsibility." Adoption of Frederick, 405 Mass. 1, 9

(1989). See Adoption of Quentin, supra (nexus shown where "mother's mental deficiencies impaired her ability to protect and care for the children"); Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021) (nexus shown where mother's "failure to address her numerous mental health issues" interfered with her parental responsibilities).

Based on the foregoing, the challenged findings of fact are amply supported by the record. Especially in light of the mother's pattern of leaving stable housing and her untreated mental health issues that coincided with neglect of the child, the judge did not "need [to] wait for disaster to happen but [could] rely upon past patterns of parental neglect or misconduct in determining current or future fitness." Adoption of Virgil, 93 Mass. App. Ct. at 301. The findings of fact are not "clearly erroneous," and we discern no "clear error of law or abuse of discretion" in the judge's unfitness determination. Adoption of Ilona, 459 Mass. at 59.

ICWA. The mother challenges the judge's application of the ICWA. She contends that the department failed to demonstrate that "active efforts" were made to prevent the breakup of the Indian family and failed to demonstrate that the child would suffer "serious emotional or physical damage" in her custody. 25 U.S.C. § 1912(d),(f).

Congress enacted the ICWA in response to "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32 (1989). The ICWA is designed "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902. "The act thus serves to protect not only the interests of the child and the parents, but of the tribe as a whole." Adoption of Arnold, 50 Mass. App. Ct. 743, 748 (2001). Congress authorized the Secretary of the Interior to "promulgate such rules and regulations as may be necessary to carry out the provisions" of the ICWA. 25 U.S.C. § 1952.

Active efforts. The pertinent Federal regulation defines "active efforts" as

> "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."

25 C.F.R. § 23.2.

The judge concluded that the department had made active efforts by facilitating visits with the mother, making referrals

to service providers, assisting the mother in locating housing, and locating the mother in the community when she became unavailable.  He further concluded that these efforts proved unsuccessful because the mother was unwilling or unable to cooperate with the department.  We discern no error.

The record provides ample support for the judge's findings and conclusions on this point.  The department developed a family action plan with the stated goal of reunification.  The plan included specific tasks for the mother designed to strengthen the familial bond:  engaging in parenting classes, attending scheduled child visits, participating in parenting activities, and preparing a household budget.  Apart from sporadic visits with the child, the mother did not complete any tasks on the action plan.  The department "repeatedly" offered to help the mother, but she "didn't engage" with the department.  According to the social worker, the department went "above and beyond" its usual role to try and help the mother.  The department repeatedly tried to "reengage" the mother and address the action plan to no avail.  The social worker "repeatedly" called the mother and left messages and searched for her in the community in places "where she might be staying."  The department tried to help the mother complete an application for assistance from the Department of Mental Health, but the mother declined to cooperate.  The department worked with three ICWA

caseworkers for the Wampanoag tribe as well as the foster mother and the child. The department developed a visitation schedule between the mother and the child. Following the COVID-19 pandemic, the department tried to develop another visitation schedule, but the mother "would not respond." Such evidence provided strong support for the judge's conclusion that the department engaged in "active efforts" to provide remedial services and rehabilitative programs designed to prevent the breakup of the child's family. 25 U.S.C. § 1912(d).

Qualified expert witness. Before the mother's parental rights could be terminated, the ICWA required the department to present expert testimony showing that "custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The social worker "regularly assigned to the Indian child may not serve as a qualified expert witness." 25 C.F.R. § 23.122(c). Testimony may come "from one or more experts." 25 C.F.R. § 23.121(b). See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979). The mother contends that the expert presented by the department was not qualified under 25 U.S.C. § 1912(f) to testify about the likelihood of "serious emotional or physical damage to the child." We agree.

The department offered a member of the Peoria Indian Tribe of Oklahoma as its expert. The witness's educational background included a bachelor's degree in economics (modified by Native American studies) as well as a law degree. The witness explained that her modified undergraduate degree was similar to, but not designated as, a minor in Native American studies because at the time of her degree the college had a Native American studies program rather than a department. She has been a member of the Indian Child Welfare Association since 2008 and received training through that organization on the ICWA. She has practiced law in Massachusetts since 1999 and is certified to take care and protection cases. Her work experience includes roles as a court investigator, educational advocate, and guardian ad litem. She has presented training programs on the ICWA for members of the local bar and previously qualified to testify as a "Native American expert" in Massachusetts courts in "Indian child welfare cases." She has no experience working with the Wampanoag tribe.

Based on these qualifications, the department moved at trial to qualify the witness "as an expert in native American cultures and traditions." The mother indicated that she had no objection. Near the conclusion of the witness's direct testimony, the department asked whether the child would suffer serious emotional or physical damage if returned to the mother.

The witness replied that it was "a really difficult question," but based on her "reading of what has occurred over the past four years," her opinion was that the mother was "still unstable" and that it would cause the child "serious emotional damage" if he were returned to the mother. At this point, the mother objected on the ground that "[t]his is an expert in ICWA affairs, not an expert in child psychology." The judge overruled the objection.

A trial judge has "wide discretion" when deciding whether to qualify an expert witness, and such decision "will be reversed only where it constitutes an abuse of discretion or other error of law." Commonwealth v. Javier, 481 Mass. 268, 285 (2019), quoting Commonwealth v. Frangipane, 433 Mass. 527, 533 (2001). "The crucial issue is whether the witness has sufficient 'education, training, experience and familiarity' with the subject matter of the testimony" (citation omitted). Letch v. Daniels, 401 Mass. 65, 68 (1987). See Mass. G. Evid. § 702 note (2023). "[A] judge's discretion can be abused when an expert witness is permitted to testify to matters beyond an area of expertise or competence." Frangipane, supra.

In the present case, the expert's testimony lacked the requisite foundation about her ability to predict the likelihood of harm to the child. In cases in which 25 U.S.C. § 1912(f) applies, an expert witness (or expert witnesses) "must be

qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe" (emphasis added). 25 C.F.R. § 23.122(a). Neither the governing statute nor regulations provide any exception when, as here, a child is placed with another member of the same tribe. Such mandated, specialized expertise on the issue of emotional or physical harm requires more than showing that the witness has knowledge and experience in economics, Native American studies, law, the ICWA, care and protection cases, and the customs of the Peoria Indian Tribe of Oklahoma. See Oliver N. v. State, 444 P.3d 171, 179-180 (Alaska 2019) (while experts were qualified to testify to tribal customs and standards and had backgrounds involving ICWA, they lacked sufficient expertise to opine on likelihood of harm to child if returned to parent's custody).

To qualify as an expert on that issue, the witness must be capable of testifying to "a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child." 25 C.F.R. § 23.121(c). See 25 C.F.R. § 23.121(d) ("evidence that shows only the existence of community or family poverty, isolation,

single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute" sufficient evidence to terminate parental rights under ICWA).  While the statute and regulations do not specify what type of background is needed for a witness to so qualify, courts that have considered the question have uniformly concluded, based on the legislative history of the ICWA and guidelines issued by the Bureau of Indian Affairs, that expertise beyond the qualifications of a "normal" social worker is required.  See, e.g., Eva H. v. State, Dep't of Health & Social Servs., Office of Children's Servs., 436 P.3d 1050, 1054-1055 (Alaska 2019), overruled on other grounds by State v. Cissy, 513 P.3d 999 (2022); Matter of M.F., 290 Kan. 142, 153-154 (2010).  For example, courts have qualified witnesses as experts in this area where they had "substantial education in social work or psychology and direct experience with counseling, therapy, or conducting psychological assessments."  Eva H., supra at 1057.  See M.F., supra at 154-155 (citing cases).

The witness here lacked any comparable experience.  Her testimony failed to illuminate how her background and experience would help the trier of fact to understand the causal relationship between the conditions in the home and the likelihood of serious emotional or physical damage to the child. See Eva H., 436 P.3d at 1058 (witness with long experience as

attorney and guardian ad litem, but with no training in social work, psychology, or counselling, not qualified to testify about emotional or physical harm).  Contrast Walker E. v. State, Dep't of Health & Social Servs., Office of Children's Servs., 480 P.3d 598, 610 (Alaska 2021) (concluding, under plain error review applicable to unpreserved objections, that expert was qualified because her "long experience as a caseworker would naturally have involved assessing likelihood of harm"); Matter of Candace A., 332 P.3d 578, 586 (Alaska 2014) (witnesses qualified where both had "substantial education" in social work, one worked as supervisor at child welfare agency overseeing hundreds of cases, and other had lengthy work history as mental health clinician).

Even in the absence of such specific Federal requirements, we conclude that the witness's experience and training did not provide a sufficient foundation for "the subject matter of the testimony," that being the likelihood of harm to the child if he were returned to the mother's custody.  Letch, 401 Mass. at 68. See Commonwealth v. Rintala, 488 Mass. 421, 437 n.29 (2021) ("That [witness] had worked in the paint industry for twenty years and was involved with the design and production of the paint at issue here does not mean that he was qualified as an expert witness on any topic related to paint"); Frangipane, 433 Mass. at 535 ("judge's qualification of the witness in the field of child abuse in no way extended to a qualification in the area

of the neurological or medical functioning of the brain"); Timmons v. Massachusetts Bay Transp. Auth., 412 Mass. 646, 649 (1992) ("Although the expert was qualified to offer his opinion on the plaintiff's inability to work paid police details and to teach self-defense classes, the expert was not qualified to testify on the issue of the permanency of the plaintiff's injuries").  This is not a situation where a "generally qualified" expert in a particular discipline is allowed to testify about a discrete question of knowledge in a "subspecialty."  Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990).  See, e.g., Commonwealth v. Crouse, 447 Mass. 558, 569 (2006) (expert in cause and origin of fire permitted to opine about "delay between fire ignition and alarm activation"); Letch, supra ("medical expert need not be a specialist in the area concerned").  As a gatekeeper, a judge "must be satisfied that the witness offered for this purpose has an expertise with regard to the subject of inquiry."  W.G. Young, J.R. Pollets, & C. Poreda, Evidence § 702.8 at 811-812 (3d ed. 2023).  That expertise, regarding the likelihood of harm to the child if he were returned to the mother's custody, was not present in this case.  Because the witness did not explain how her background and experience would enable her to predict the likelihood of harm under 25 U.S.C. § 1912(f), we must vacate the decree terminating the mother's parental rights.

<u>Conclusion</u>.  We vacate the decree and remand the matter for further proceedings consistent with this opinion.  On remand the judge may in his discretion take additional evidence on the issues of the mother's current unfitness and the best interests of the child.  Given the disposition of this case, we need not address the mother's challenge to the posttermination visitation order.

<u>So ordered</u>.