NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-994

ADOPTION OF QUINDEL.[1]


MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree of a Juvenile Court judge that found him unfit to parent his son (the child), and that terminated the father's parental rights.[2] As found by the judge, the father has been homeless through much of the child's life, and has failed to demonstrate a commitment to forming a stable relationship with the child or to understanding the child's particularized needs. The father also has a history of criminal conduct, including many prosecutions and convictions for dealing controlled substances. As of the date of termination of his parental rights, the father was subject to an as yet unexecuted

---

[1] A pseudonym.

[2] The mother's parental rights were also terminated after the judge granted the Department of Children and Families' (department) petition to terminate the rights of both parents. Mother appealed, but this court dismissed her appeal with prejudice after a stipulation entered in the Juvenile Court allowing the mother limited visitation. The mother has signed an open adoption agreement which provides for the child's adoption by his maternal grandmother.

sentence of up to five years imprisonment based upon a conviction for trafficking and possession with intent to distribute controlled substances; the father was in the community only because his sentence had been stayed pending appeal.

In this appeal, the father argues that the trial court (1) mischaracterized episodes of tension with the mother as domestic violence, and inappropriately relied on this evidence in concluding the father was unfit, and (2) improperly weighed evidence of the father's criminal activity against him. The father also presents arguments pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208 (1981) that (3) there was insufficient evidence to support the trial court's finding of unfitness, (4) the Department of Children and Families (department) exhibited "prejudice" in its treatment of him, and (5) he received ineffective assistance of counsel. Because the judge's findings and the record show clear and convincing evidence of unfitness (without regard to any evidence of domestic violence), we affirm.

Background. We summarize the judge's findings of fact, which are amply supported by the record. The child was born in 2015 and the department has been involved with him since he was an infant. The mother has a history of drug use, and the child was born with neo-natal abstinence syndrome resulting from his

2

exposure to methadone in utero.  The child was removed from mother and father soon after his birth in 2015.  Although the child was temporarily returned to the mother's custody on condition that the mother live with the child's maternal grandmother, the child was removed again following the mother's relapse.  In 2016, the department placed the child with the maternal grandmother; the child has lived with the maternal grandmother for all but five months of his life.

In September 2015, the department petitioned to terminate the parental rights of both the mother and the father, and the case was tried over eleven days between November 2020 and June 2021.  The judge's decision details her reasons for her determination of unfitness and termination of the father's rights.  When the mother was four months pregnant, the father was arrested after a street-level drug transaction.  The police found several bags of what was believed to be crack cocaine on the father's person, and he was charged with two drug related offenses.  During an assessment following the child's birth, the father told the assessment worker that he had made a living distributing controlled substances for "some" time.  The trial judge found that the father "actively dealt in controlled substances from at least January 2010 . . . until at least April 2018" based, among other things, on a review of the father's court activity record information (CARI) file, the father's

admission to the assessment worker that he had sold controlled substances, and the police reports in evidence. The father's criminal activity led to his repeated incarceration after the child was born, for periods of several days to several months at a time.

In January 2019, the father was convicted of two drug offenses and sentenced to a term of four to five years in prison. He was released from custody pending a decision on his motion for a new trial, which remained under advisement throughout the trial of this case. The trial judge found that, under these circumstances, there was a "substantial risk" that the father would be incarcerated again after this case was resolved, leaving him unable to care for the child. The judge thus concluded that the father's "criminal record is relevant to his current fitness."

The judge also noted that the father "has spent the first six plus years of [the child's] life as a mostly passive, largely disengaged, or absent observer." Indeed, the judge's findings of fact show a pattern of the father's failure to meaningfully take part in the child's care. During his prison terms, the father often chose not to have visits with the child and was otherwise unavailable to care for the child. While the mother remained in the grips of addiction, the father "could have been actively engaged in [the child's] life and services to

4

aid [the father] in caring for [the child] but was not."
According to the testimony of the social worker assigned to the
case, the father missed numerous scheduled visits, and arrived
unprepared to many of those that he did attend.  The judge found
that the father's testimony "revealed that he has little
understanding of [the child] and has remained wholly ignorant of
[the child's] needs, diagnosis and treatment."

The judge also considered the father's "precarious housing
situation."  At the time of trial, the father had no stable
home.  The father "continues to live on the street and remains
without a steady job or any obvious means of support other than
unemployment compensation."  The father has sufficient funds to
secure housing but chooses not to do so.  Although the father
claimed he could live with a friend in New Hampshire, such a
move would require approval by the Superior Court and relief
from law enforcement's GPS monitoring of his movements.

Finally, the judge examined several episodes of what he
characterized as "domestic violence and controlling behavior."
At trial the father testified that he and the mother had
"tussled" and that there had been physical pushing in the
relationship.  The judge noted that the father was "a compact
and powerfully built man" while the mother was a "slight woman."
In August 2019, the mother reported to the department's social
worker that the father had "hit her in the face and pushed a

drink into her causing it to spill on her."  When the social worker responded to the scene, she found the mother with an abrasion on her lip and fluid on her shirt.  Finally, the judge found that during a phone call, the father told the mother that "if she did not pursue the career path that he favored he could find another girlfriend."  The judge considered these comments an attempt to "control [the mother's] educational and vocational choices by suggesting that he would not be her boyfriend if she did not pursue the course he favored."  The judge concluded that the relationship between the mother and father was "infected with domestic violence."

In finding the father unfit and terminating his rights, the judge relied upon all of the above facts.  She concluded that such unfitness was likely to continue "indefinitely into the future."  This appeal followed.

Discussion.  1.  Unfitness.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of the evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  We treat the judge's findings with substantial deference and disturb them only upon a determination that they

6

are clearly erroneous.  See id. at 606-607.  "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age."  Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016).  Only "grievous shortcomings" are sufficient to demonstrate unfitness.  Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997).  The judge must determine "whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'"  Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

a.  Domestic violence.  The father makes several arguments concerning the sufficiency of the evidence and the judge's characterization of certain aspects of the record.[3]  First, the father claims that the trial court erred in finding that that the relationship between the mother and the father was characterized by domestic violence.  He argues that the court "mischaracterized non-violent and unclear representations of

_____

[3] As required, the judge considered the factors set forth in G. L. c. 210, § 3 (c), and found factors (ii), (iii), (iv), (vi), (viii), and (x) applicable.  As discussed below, an analysis of factor (ii) represents only one part of a broader landscape of considerations that, taken together, weigh in favor of terminating the father's parental rights.

7

behavior as evidence of domestic abuse," and that this constituted clear error.

As the trial judge notes in his decision, "evidence of domestic violence is highly relevant to the parental fitness determination."  See Custody of Vaughan, 422 Mass. 590, 595, 599 (1996); Care & Protection of Lilith, 61 Mass. App. Ct. 132, 139 (2004).  Section 3(c) of G. L. c. 210 (factor ii) explicitly states that abuse of "another member of the immediate family of the child . . . [resulting from] the acts . . . of one or both parents" and the fact that the abusive parent was "offered or received services intended to correct the circumstances . . . and refused . . . to utilize such services" is to be considered as an element of the parental fitness determination.  Here, there was indeed evidence of physical violence between the mother and father.  The father testified that he and the mother had physically "tussled" and pushed each other, and on one occasion, the mother reported that the father had hit her in the face and pushed a drink into her.  As a result of the latter episode, mother sustained a cut on her lip.  The father takes issue with the judge's findings regarding these events, and with

the weight the judge assigned to them.  The judge's findings, however, are not clearly erroneous.[4]

More importantly, however, we are unpersuaded by father's focus on the judge's domestic violence findings for the more basic reason that they simply did not play a pivotal role in the judge's decision.  A review of that decision reveals that several other factors, including the father's general lack of engagement in the life of the child and his pending term of incarceration, played a much more significant role in the ultimate finding of unfitness.

b.  Criminal record.  Second, the father argues that the judge gave undue weight to the father's criminal history.  As the judge explained, however, a parent's history of criminal convictions can be relevant, at least insofar as the parent's criminality bears on the parent's ability to assume custody of the child without causing the child harm or neglect.  Care & Protection of Frank, 409 Mass. 492, 494 (1991); Care & Protection of Leo, 38 Mass. App. Ct. 237, 244 (1995).  As this case shows, a parent may be at risk of incarceration.  Beyond that, criminal conduct may reflect on the character of a parent

_____

[4] In so ruling, we do not rely on the incident where the father used "controlling" language during a phone call with the mother as evidence of domestic violence.

seeking custody, and there are many ways in which criminal conduct can lead to harm to a child.  <u>Frank</u>, <u>supra</u> at 495.

The record in the instant case shows that father has a substantial history of criminal conduct.  The father himself admitted to making a living distributing controlled substances for "some time."  His CARI is replete with drug-related charges, property crimes, and assault and battery offenses.  He has been incarcerated multiple times during the child's life and has declined regular visits while incarcerated.  Importantly, at the time of trial he was subject to a sentence of up to five years, as he awaited a decision on a motion for a new trial.  The above provides ample support for the judge's consideration of the father's criminal past in her fitness evaluation.

Lastly, the father makes the general argument that there was insufficient evidence to support the trial court's determination of unfitness.  However, the trial court's opinion specifically identifies the six statutory factors applicable to its determination of the father's unfitness and provides thorough discussions of each.  As detailed above, the judge's findings -- that father had been largely uninvolved in the child's life, had engaged in a significant pattern of criminal conduct, and failed to show stable housing -- amply support the trial court's ultimate finding of unfitness.

2. "Prejudice." The father also claims that the trial court's decision to terminate his parental rights was "tainted" by the department's "prejudice" against him. The evidence of "prejudice" cited by the father consists essentially of the father's own conclusory allegations at trial that the department's social worker and the child's maternal grandmother were biased against him. References to the social worker's testimony merely indicate that she had "two or three" phone calls with the Boston Police Department about the father's criminal record and that she had not seen the father lose his temper to the point where she was fearful. In her findings, the trial judge responded to the father's allegations of bias as to the social worker, finding that "there [was] no evidence that [the social worker] ever stopped [the father's] visitation" due to bias. Upon our own review of the relevant sections of the record, we also perceive no evidence of prejudice or bias.

3. Ineffective assistance of counsel. Finally, the father claims ineffective assistance of counsel based on his trial counsel's failure to call two witnesses that the father claims would have presented favorable testimony, and trial counsel's failure to assist in creating an effective alternative custody plan.

Because the ineffective assistance argument is raised for the first time on appeal, we have no record with which to

11

evaluate the strategic decisions of counsel.  "Absent exceptional circumstances, we do not review claims of ineffective assistance of counsel for the first time on appeal." In re Stephen, 401 Mass. 144, 150 (1987).  Cf. Commonwealth v. Zinser, 446 Mass. 807, 811 (2006) ("ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions" [citation omitted]).  Here, there is insufficient evidence to justify an analysis under Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), and we accordingly decline to reach the issue of ineffective assistance of counsel.

As the record supports the decision to terminate the father's parental rights, the decree is affirmed.

<u>So ordered</u>.

By the Court (Vuono, Singh & Englander, JJ.[5]),

*Joseph F. Stanton*

Clerk

Entered:  November 20, 2023.

---

[5] The panelists are listed in order of seniority.