NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-644                                        Appeals Court

ADOPTION OF LISETTE (and a companion case[1]).


No. 17-P-644.

Essex.        December 1, 2017. - May 30, 2018.

Present:  Agnes, Blake, & McDonough, JJ.


Adoption, Care and protection, Dispensing with parent's consent.
    Minor, Adoption.  Parent and Child, Adoption, Dispensing
    with parent's consent to adoption.  Evidence, Medical
    record.


    Petitions filed in the Essex County Division of the
Juvenile Court Department on February 10, 2014, and October 2,
2014.

    The cases were heard by José A. Sánchez, J.


    Robert E. Curtis, Jr., for the mother.
    Brian Pariser for Department of Children and Families.
    Debra Perrotta Dow for the children.


    McDONOUGH, J.  In this case, we are called on to balance

two compelling interests:  the need to protect the privacy of

persons seeking drug rehabilitation treatment from having their

---

    [1] Adoption of Adam.  The children's names are pseudonyms.

treatment records disclosed against their will, and the crucial need to protect children from abuse and neglect and promote their best interests.  We conclude that under the limited circumstances of this case, the best interests of the children outweigh the mother's right to confidentiality in information concerning her treatment.

Following a trial in the Juvenile Court in 2016, the judge found the mother unfit[2] to care for her two children, Lisette and Adam, and that termination of her parental rights was in their best interests.  See G. L. c. 119, § 26; G. L. c. 210, § 3.  On appeal, the mother contends that the judge erred by (1) ordering the drug rehabilitation program in which she was enrolled to produce an affidavit giving the reasons for her departure from that program; and (2) failing to find a nexus between her "shortcomings" and a risk of harm to the children.  We affirm the decrees entered by the Juvenile Court judge terminating the mother's parental rights.

---

[2] Despite the moral overtones of the statutory term "unfit," the judge's decision is not a moral judgment, nor is it a determination that the parent does not love the children.  The question for the judge is "whether the parent's deficiencies 'place the child[ren] at serious risk of peril from abuse, neglect, or other activity harmful to the child[ren].'" Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011), quoting from Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

Background.  The following facts found by the judge are amply supported by the record.[3]  In 2007, the mother gave birth to Lisette.  The mother and Lisette's biological father were in a relationship at the time, but are no longer together.[4]  The mother later began a relationship with Adam's father, and Adam was born in December of 2013.[5]  The mother continued to have an on-and-off relationship with Adam's father up through the time of trial.

The mother has an extensive history with the Department of Children and Families (department), and a long history of substance abuse and domestic violence.  She "has a consistent pattern of abusing heroin and failing to engage in services to help her maintain her sobriety."  She tested positive for opiates when admitted to the hospital prior to Adam's birth in December of 2013, and tested positive for benzodiazepines in January of 2014.  The mother also admitted that she used cocaine from September of 2015 until she enrolled, just before trial, in a rehabilitation program in March of 2016.

---

[3] The mother does not challenge the judge's factual findings, aside from two specific findings discussed in more detail infra.

[4] Lisette's father stipulated to his unfitness at trial, and is not a party to this appeal.

[5] Adam's father did not participate in the proceedings below and has not appealed from the termination of his parental rights.

The mother also has a history of domestic violence with both of the children's fathers. In July of 2014, police responded to the mother's home for reports of a domestic disturbance between her and Adam's father. One month later, the mother obtained a G. L. c. 209A restraining order against Adam's father, stating in her affidavit that he spit in her face, grabbed her throat and choked her, then grabbed her hair and threatened to kill her. After she locked him out of the house, he tried to reenter through a window. When the mother tried to stop him, he pulled her halfway out the window by her hair. On another occasion, the mother testified that Adam's father tied her up with an electric cord. Despite her reported concerns about Adam's father and her active restraining order against him, the mother continued to allow him in her home. The department filed a care and protection petition on behalf of Lisette after receiving a report that Lisette found Adam's father in the mother's bed. After a temporary custody hearing, the judge granted the department custody of Lisette, and she has remained in the department's custody since then.

Adam first came to the department's attention in December, 2013, at just five days old. He was born when the mother was twenty-six weeks pregnant, and he tested positive for methadone at birth. The mother also tested positive for methadone and opiates when she arrived at the hospital to give birth to Adam.

Adam was diagnosed with Klinefelter syndrome, a rare condition characterized by an XXY chromosome, resulting in medical and behavioral complications including delayed speech, learning disabilities, and behavioral problems. Due to his premature birth and his diagnosis of Klinefelter syndrome, Adam presented with challenging medical issues necessitating numerous specialty appointments. These conditions caused feeding problems requiring a special formula and special bottle nipples so he could eat.

The hospital set up training for the mother to teach her how to make Adam's special formula. When the mother failed to attend, the hospital rescheduled the training to the following day. The mother arrived late to the training, and she failed to purchase the necessary bottle nipples. The mother then failed to show up for another training session. Prior to Adam's expected discharge, the hospital encouraged the mother to spend more time at the hospital to ensure that she learned his proper care. The hospital's social worker described the mother's visits as "infrequent and sporadic." The hospital social worker informed the department that the mother failed to provide a prescription for Adam's seizure medication, failed to provide the special bottle nipples for his feedings, and failed to provide his insurance information. Several days later, the department filed a care and protection petition for Adam and

took emergency custody of him.  Following his hospital

discharge, the department placed him in foster care, where he

remains.

During trial, the department learned that the inpatient

rehabilitation treatment program (program) where the mother had

been enrolled had discharged her.  The department subpoenaed the

mother's program records relating to the reasons for her

discharge.  Citing the patient confidentiality provisions set

forth in 42 U.S.C. § 290dd-2 (2012), the program manager

objected to the department's subpoena.  At a hearing on the

program manager's objection, the judge suggested -- as a less

intrusive alternative -- that he order the program manager to

prepare an affidavit limited to the circumstances of the

mother's discharge.  The parties, including the mother's

counsel, agreed,[6] and the next day the program manager submitted

the affidavit,[7] which the judge admitted in evidence over the

---

[6] The mother's counsel supported the judge's proposed
affidavit alternative, saying:  "I think the affidavit is great.
I don't have a problem with that."  Nevertheless, the judge made
clear that the parties' acceptance of his affidavit alternative
was "[w]ithout waiving any objection."  The next day, when the
department offered the program manager's affidavit in evidence,
the mother's counsel objected.

[7] In her affidavit, the program manager stated that "[i]n
accordance with the [program's] Progressive Discipline Policy,
[the mother] was terminated from the [program] on May 16, 2016,
after receiving four (4) Safety Notices."  The mother received
the notices after twice failing to sign back into the program
after appointments and for having cigarettes in her room.  The

mother's objection. The mother contends that the judge admitted the program manager's affidavit in violation of the confidentiality provisions of 42 U.S.C. § 290dd-2.

Discussion. 1. Disclosure of treatment records. Title 42 U.S.C. § 290dd-2(a) provides that "[r]ecords of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall . . . be confidential. . . ." The broad purpose of the statute is to protect the confidentiality of persons seeking treatment for substance abuse. See Whyte v. Connecticut Mut. Life Ins. Co., 818 F.2d 1005, 1010 (1st Cir. 1987).[8] However, while the statute

---

fourth notice issued after the mother (1) returned from an appointment apparently under the influence of "some substance," despite a drug screen that came back clean, and (2) for being unaccounted for on the next day for some two and one-half hours, returning apparently under the influence of an unknown substance. The program's disciplinary policy states that after receiving three notices, a resident may be terminated from the program.

[8] The Whyte decision refers to a prior version of the statute, before it was reorganized and renumbered in 1992; the language of the statute has not materially changed. See Act July 10, 1992, P.L. 102-321, Title I, Subtitle C, § 131, 106 Stat. 366. At the time of the decision in Whyte, regulations barred the disclosure of all communications; only "objective data" was subject to disclosure. See 42 C.F.R. § 2.63 (1975).

protects treatment records and their content from disclosure absent patient consent, Congress recognized that in limited circumstances, release of protected information might be necessary. See 42 U.S.C. § 290dd-2(b); 42 C.F.R. § 2.64 (1987). One such circumstance is where disclosure is "authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor." 42 U.S.C. § 290dd-2(b)(2)(C). Regulations promulgated pursuant to that

---

After the decision in Whyte, the regulation was amended to allow for the court-ordered disclosure of "confidential communications" as well. See 42 C.F.R. § 2.63 (1987), which permitted court orders authorizing disclosure of confidential communications between a patient and treatment program only if:

"(1) The disclosure is necessary to protect against an existing threat to life or of serious bodily injury, including circumstances which constitute suspected child abuse and neglect and verbal threats against third parties;

"(2) The disclosure is necessary in connection with investigation or prosecution of an extremely serious crime, such as one which directly threatens loss of life or serious bodily injury, including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, or child abuse and neglect; or

"(3) The disclosure is in connection with litigation or an administrative proceeding in which the patient offers testimony or other evidence pertaining to the content of the confidential communications."

We note that 42 C.F.R. § 2.63(2) was amended in 2017 to read as follows: "The disclosure is necessary in connection with investigation or prosecution of an extremely serious crime allegedly committed by the patient, such as one which directly threatens loss of life or serious bodily injury, including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, or child abuse and neglect."

statute require that a court's determination of "good cause" be based on two findings:  "(1) Other ways of obtaining the information are not available or would not be effective; and (2) The public interest and need for the disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services."  42 C.F.R. § 2.64(d). If good cause is established, the court must limit disclosure to those portions of the records that are "essential to fulfill the objective of the order."  42 C.F.R. § 2.64(e).  In addition, 42 C.F.R. § 2.61(a) (1987) provides that "[a]n order of a court of competent jurisdiction entered under this subpart is a unique kind of court order.  Its only purpose is to authorize a disclosure or use of patient information which would otherwise be prohibited by 42 U.S.C. [§] 290dd-2 and the regulations in this part.  Such an order does not compel disclosure.  A subpoena or a similar legal mandate must be issued in order to compel disclosure.  This mandate may be entered at the same time as and accompany an authorizing court order entered under the regulations in this part."[9]

a.  <u>Other available effective methods</u>.  Our first task is to determine whether there was another available effective way

_____

[9] Here, there was both a subpoena issued by the department to the program and an order issued by the judge, thereby compelling the production of the program manager's affidavit at issue.

to obtain the program discharge information other than by affidavit based on facts derived from the mother's program records. In its subpoena to the program manager, the department sought "[a]ny documents and information regarding the discharge of [the mother]." At the hearing on the program manager's objection to the subpoena, the department's counsel made clear that the department sought only information about the circumstances of the mother's discharge from the program and any documentation relating to that narrow issue. The judge determined that an affidavit narrowly tailored to the reasons for the mother's discharge would sufficiently cover the issue the department sought to explore at trial. Counsel for both the mother and the program agreed that an affidavit so limited would be preferable to disclosing any of the mother's treatment records.

On appeal, the mother maintains that the department had other sources from which to obtain this evidence, namely, either her own testimony or the testimony of the department's social worker assigned to the mother's case. In making her argument, the mother overlooks significant evidentiary obstacles. Testimony from the department social worker about what the program's staff told her about the mother's discharge would

constitute inadmissible hearsay.[10,11]  See generally Mass. G.
Evid. § 801 (2018).  Furthermore, putting aside the hearsay
problem, even were the mother to authorize the program to
disclose to the department's social worker the details of the
mother's discharge, regulations promulgated under 42 U.S.C.
§ 290dd-2 would bar the social worker from redisclosing that
information in court, without the mother's consent.  See 42
C.F.R. § 2.32(a)(1) (1987) (disclosures made with patient's
consent must be accompanied by notice stating that "federal
rules prohibit you from making any further disclosure of
information in this record").  With regard to the mother's
testimony explaining her discharge, the judge determined that
absent an independent source, he doubted he could rely on the
mother's testimony alone.  This decision was well within the
judge's discretion.  See Care & Protection of Three Minors, 392
Mass. 704, 711 (1984) (judge is not required to view evidence

---

[10] Indeed, when a different social worker testified, the
judge sustained objections to questions about what the program's
staff told him about the mother's level of compliance.

[11] While it is true that certain types of hearsay are
admissible in care and protection proceedings, it does not
appear that any of those exceptions would have governed this
issue.  See Care & Protection of Rebecca, 419 Mass. 67, 80-81
(1994) (child's hearsay statements regarding sexual abuse
admissible pursuant to G. L. c. 233, § 83); Custody of Michel,
28 Mass. App. Ct. 260, 265-268 (1990) (hearsay contained in
investigator's reports and in G. L. c. 119, §§ 51A and 51B,
reports admissible).  See also Mass. G. Evid. § 1115 (2018).

from mother's perspective).  Thus, we agree with the judge that there was no available effective way for the department to provide evidence of the circumstances surrounding the mother's discharge from the program, other than through the program manager's affidavit.

b.  Need for disclosure.  Having concluded that other than obtaining the program manager's affidavit, there existed no effective means for the department to obtain admissible evidence of the circumstances of the mother's program discharge, we turn to the second step of 42 C.F.R. § 2.64(d):  weighing the public interest and need for disclosure against the potential injury to the mother, the physician-patient relationship, and the treatment program.  In assessing the public interest, our courts have long held that in care and protection matters, the interests of a child in being free from abuse and neglect, and the Commonwealth's interests in protecting the child's welfare, outweighs the concerns of the parent.  See Custody of a Minor, 375 Mass. 733, 749 (1978), quoting from Purinton v. Jamrock, 195 Mass. 187, 199 (1907) ("[W]here a child's well-being is placed in issue, 'it is not the rights of the parents that are chiefly to be considered.  The first and paramount duty is to consult the welfare of the child'"); Care & Protection of Robert, 408 Mass. 52, 62 (1990) ("The child's interest in freedom from abusive or neglectful behavior, however, is absolute.  In no

situation may a child be legitimately subjected to abusive or neglectful conditions").[12]

The need for the narrowly tailored evidence explaining the mother's discharge from the program also supports disclosure. The purpose of care and protection proceedings is "to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development."  G. L. c. 119, § 1, as amended by St. 2008, c. 176, § 82.  Here, the judge decided that evidence of the circumstances of the mother's discharge from the treatment program was an important component of his fitness determination, and concluded that, "because the underlying allegations involve a significant repetitive history of substance abuse and her failure to engage in services that would remedy the circumstances that led to the filing of this care and protection [petition], I have to find that there is good cause for a disclosure of the records."  Thus, both the public interest and the need for the judge to learn the circumstances

---

[12] Courts of other jurisdictions have reached similar conclusions when applying 42 U.S.C. § 290dd-2 to cases involving children's welfare.  See Doe v. Daviess County Div. of Children & Family Servs., 669 N.E.2d 192, 195 (Ind. Ct. App. 1996) (mother's right to nondisclosure "must give way before the duty of the court to prevent harm and to safeguard . . . the child"); Matter of Baby X, 97 Mich. App. 111, 120 (1980) ("[I]n neglect proceedings confidentiality must give way to the best interests of the child").  The Doe and Baby X opinions refer to the statute prior to the 1992 reorganization and renumbering.  See note 8, supra.

of the mother's program discharge weigh heavily in favor of disclosure.

In contrast, any risk of injury to the mother, to the physician-patient relationship, and to the treatment program, is negligible.  As the judge noted, the private nature of a Juvenile Court proceeding, and the fact that the records of the proceedings below are impounded and therefore not open to indiscriminate public inspection, minimizes the likelihood of the mother's treatment becoming a matter of public record.  See G. L. c. 119, § 38; G. L. c. 210, § 5C.  In addition, any impact on the mother's physician-patient relationship with the program is, at best, minimal because her treatment at that program had already ended by the time the department subpoenaed her records.  Nor can she credibly contend that releasing the limited information derived from her records deterred her from seeking treatment elsewhere, since she subsequently identified a different program in which she intended to enroll.  Finally, the mother herself opened the door to an exploration of her program compliance by testifying that she was in substantial compliance with its rules.  And, as counsel for the parties agreed, the program manager's narrowly focused affidavit explaining the reasons for her discharge was preferable to the release of any of her treatment records.  This limited disclosure, combined with the program's zealous protection of its patients' rights in

contesting the department's subpoena, minimizes any risk of injury to the program.

Because the interests of the children in being free from abuse and neglect substantially outweigh any unlikely injury to the mother from this limited disclosure of confidential information, we conclude that the judge had good cause to order the program manager to disclose by affidavit the reasons for the mother's discharge from her treatment program, in accordance with 42 U.S.C § 290dd-2.[13]  See Adoption of Virgil, 93 Mass. App. Ct.    ,    (2018).

2.  Determination of unfitness and termination of parental rights.  The mother also argues that the judge erred in his unfitness conclusion because he failed to connect the unfitness finding to any risk of harm to the children.  We review the decision of the judge to determine whether there was any abuse of discretion or error of law.  Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1134 (1999).  We review findings of fact under the familiar "clearly erroneous" standard.  See Adoption of Adam, 23 Mass. App. Ct. 922, 924 (1986); Adoption of Jacques, 82 Mass. App. Ct.

---

[13] Therefore, the mother's contention that the judge was clearly erroneous in finding that her discharge from the program was based on "violations of policy" must fail.  If the judge properly admitted the affidavit, there was evidence to support the judge's finding.

601, 606-607 (2012).  In doing so, we grant substantial deference to the judge's decision, because a "judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment [regarding fitness]."  Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

"The interest of parents in their relationship with their children [is] fundamental [and] constitutionally protected." Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 587 (1981) (quotation omitted).  A State's intervention into a family is justified only if the parents are "shown to have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard."  Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975).

"[T]he term 'unfitness' signifies something more than a standard by which we measure the limits of acceptable parental conduct[; it] is a standard by which we measure the circumstances within the family as they affect the child's welfare."  Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. at 589.  It requires careful consideration, reflecting the unique facts present in each case, of the capacity of the parents to care for the child.  See Freeman v. Chaplic, 388 Mass. 398, 405 (1983).  The department

bears the burden of proving parental unfitness by clear and convincing evidence.[14]  Adoption of Lorna, 46 Mass. App. Ct. 134, 139 (1999).

The welfare of the child is the most important consideration when determining parental fitness.  See Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. at 589.  "[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child."  Bezio v. Patenaude, 381 Mass. 563, 576 (1980).  The parental unfitness test and the best interests of the child test are not mutually exclusive, but rather reflect different degrees of emphasis on the same factors.  See Adoption of Kimberly, 414 Mass. 526, 528 (1993).

We disagree with the mother's contention that the judge's findings of fact do not support his determination that she is unfit, and that he failed to connect his findings regarding her unfitness to any risk of harm to the children.  On the contrary, the judge explicitly connected his findings to the risk of harm to the children should they be returned to her custody.  Specifically, the judge found that "[the mother] has also failed to adequately address the domestic violence in the home or

---

[14] Clear and convincing evidence is evidence that is "strong, positive and free from doubt."  Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 871 (1975) (quotation omitted).

complete a domestic violence program." He found that she "was involved in several abusive relationships and suffered vicious beatings at the hands of her abusers." However, despite vowing to end her abusive relationships and even obtaining a restraining order against Adam's father, she continued to associate with him on numerous occasions. Finding that "[t]here is no evidence that [the mother] completed any domestic violence program or would not repeat this vicious cycle again," the judge concluded, "[the mother's] inability to extricate herself from these abusive relationships bears on her ability to protect the subject children from the grievous type of harm." See Adoption of Zak, 87 Mass. App. Ct. 540, 543 (2015), quoting from Custody of Vaughn, 422 Mass. 590, 595, 599 (2015) ("[W]itnessing domestic violence, as well as being one of its victims, has a profound impact on children. . . . [A] child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm").[15]

---

[15] The mother's argument that any domestic violence occurred when the children were at school, and thus was not witnessed by or directed toward them, is unpersuasive. A parent's willingness to ignore or minimize abusive behavior can be an indicator of unfitness, regardless of whether the child is at risk of abuse or witnessing abuse. See Adoption of Anton, 72 Mass. App. Ct. 667, 674-675 (2008) (mother's refusal to end relationship with man convicted of child sexual abuse properly considered by judge despite no evidence that subject child was at risk of abuse).

With regard to drug abuse, the judge concluded that "[the mother] has longstanding addiction issues and has relapsed several times prior to and since the initiation of these petitions." He also found that "[i]n over two years since [Adam] has been removed from her custody, [the mother] has not been able to complete a substance abuse program," and that when she did enroll in such a program, the program terminated her for noncompliance after only ten weeks. The judge did not credit the mother's testimony that she had been drug-free since 2003 and that she only started abusing drugs again once the department removed the children from her care. That testimony conflicted with evidence of positive drug tests in December of 2013 and January of 2014, as well as an incident in September of 2015 when police found her incoherent with "track marks" on her arms. Finally, the judge noted that the mother failed to complete a substance abuse treatment program, having enrolled in a program shortly before trial some two years after the removal of the children. He concluded that "[the mother] has not taken action to remedy . . . her repeated drug use . . . and is unable to see how these issues negatively [a]ffect the subject children. . . . [The m]other has clearly demonstrated an enduring inability to parent the subject child[ren]."

As to Adam, the judge again connected his findings to the risk of harm to the child. Specifically, he found that "[Adam]

has substantial medical and emotional needs due to his premature birth and genetic condition." The judge also found that "[the mother] does not fully understand the scope of his medical issues as she did not think that it was important to meet with his dietician[16] or obtain the necessary feeding implements and stated to the court investigator that the [d]epartment was making it seem like he was sicker than he was." He concluded, "[the mother] has little understanding of [the child's] substantial medical issues, and developmental delays and is unwilling and/or unable to provide the constant supervision and consistency for his social, emotional, and physical well-being." The record well supports these findings. See Adoption of Oliver, 28 Mass. App. Ct. 620, 625-626 (1990) (parental unfitness can be established where child has substantial needs

---

[16] The mother takes issue with this finding because the judge relied on a statement contained in a G. L. c. 119, § 51A, report (51A report), admitted during Adam's temporary custody hearing, but not admitted at trial. Without expressing an opinion on the propriety of the judge's decision to consider a 51A report that was not admitted in evidence, we note that there is ample evidence in the record from which the judge could infer that the mother did not take Adam's medical issues seriously. Specifically, the judge found that the mother (1) did not appear for the initial appointment with the hospital, (2) was late to the rescheduled appointment and did not bring the necessary bottle nipples, (3) had infrequent and sporadic visits with Adam at the hospital, (4) failed to provide the prescription for Adam's seizure medication, and (5) told an investigator that Adam was not sickly and that the department made him out to be sicker than he actually was. The mother does not contest these findings.

requiring extraordinary attentiveness from caregiver and where parent has little or no understanding of those needs, or willingness or ability to meet them); Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption, 389 Mass. 793, 799-800 (1983) (specialized needs of particular child considered with parent's character, temperament, capacity, or conduct may clearly establish parental unfitness).

Thus, we conclude that the record is replete with evidence supporting the judge's unfitness determination. The judge's findings are detailed and thorough, and show that he gave the case his close attention. See Custody of a Minor (No. 1), 377 Mass. 876, 886 (1979). The record belies the mother's argument that the judge's findings are insufficient to support his conclusions. We think it plain that the mother simply views the evidence differently from how the judge viewed it. The judge is not required to view the evidence from the parent's perspective. See Care & Protection of Olga, 57 Mass. App. Ct. 821, 824 n.3 (2003), quoting from Anderson v. Bessemer City, 470 U.S. 564, 573-574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

After a determination of unfitness, a "judge must determine whether the parent's unfitness is such that it would be in the child[ren]'s best interests to end all legal relations between

parent and child[ren]."  Adoption of Nancy, 443 Mass. 512, 515 (2005).  In order to terminate a parent's parental rights, the unfitness element must be so probative and persuasive that it can serve as a predicate for finding that the unfitness will continue undiminished into the future, affecting the welfare of the child.  See Adoption of Carlos, 413 Mass. 339, 350 (1992).  While consideration of the reasonable likelihood that a parent's unfitness at the time of trial may only be temporary is appropriate, such a prediction must rely "upon credible evidence rather than mere hypothesis or faint hope."  Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001) (quotation omitted).  See Adoption of Carlos, supra.[17]

As noted supra, the judge's finding that the mother is currently unfit was clearly and convincingly supported by the evidence presented at trial.  The judge found, "[the mother] has longstanding issues with drug abuse and domestic violence which she has not adequately addressed. . . .  She has not taken action to remedy either her repeated drug use or repeated abusive relationships and is unable to see how these issues negatively [a]ffect the subject children.  She remains

---

[17] "'[A] condition which is reasonably likely to continue for a prolonged indeterminate period, such as alcohol or drug addiction . . . [that] makes the parent . . . unlikely to provide minimally acceptable care of the child' is not a temporary condition."  Adoption of Elena, 446 Mass. 24, 31 (2006), quoting from G. L. c. 210, § 3(c)(xii).

noncompliant with several service plan tasks." Based on these findings, the judge concluded that the mother remains unfit to care for the children and that her unfitness is likely to continue indefinitely. There was no error in the judge's conclusions.

In this case, the judge made meticulous findings, amply supported by the record, supporting his conclusion that the mother's long-standing substance abuse and her inability to extricate herself from violent relationships were unlikely to be resolved in the future. In addition, the record supports the judge's conclusion that the mother is unable to provide adequate medical care for Adam, for whom she has never been the primary caregiver. The judge noted in his findings that Adam's preadoptive parents, with whom he has lived since his hospital discharge, have provided satisfactory care for the child, and that notwithstanding his medical challenges, he continues to make improvements. The judge also found that Lisette has made significant improvements since her removal from the mother's custody, especially improving in school and with her behavioral issues. It has now been more than two years since the children's placement in the department's custody. At some point, the judge must say "enough," and act in the best interests of the children. Adoption of Nancy, 443 Mass. at 517 ("[C]hildren deserve permanence and stability"). See Adoption

of Ilona, 459 Mass. 53, 60 (2011) ("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period").

Conclusion.  For the reasons stated, there was no error in the termination of the mother's parental rights.

Decrees affirmed.