NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-997

ADOPTION OF ZYGMUNT (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother is the parent of Zygmunt, Erik, and Luke, and the father is the parent of Erik and Luke.[2] In 2019, the children were removed from the mother's and father's custody after a report that the father physically abused Zygmunt. After trial on the care and protection petition in 2021, a Juvenile Court judge found the father unfit to parent his children, Erik and Luke, and the mother unfit to parent her children, Zygmunt, Erik, and Luke; the judge terminated their parental rights to their respective children.[3] On appeal, both parents argue that the trial judge abused his discretion and committed clear error

---

[1] Adoption of Erik and Adoption of Luke. The children's names are pseudonyms.

[2] As further described infra, the mother and the father are also the parents of Michael (a pseudonym), who was born after Zygmunt, Erik, and Luke were removed from their custody. Michael is not a part of these proceedings.

[3] The mother reported that Zygmunt's father is deceased. The judge terminated the parental rights of any unknown or unnamed father of Zygmunt.

by finding that they were each unfit to parent their respective children.  We affirm.

Discussion.  1.  Father's appeal.  a.  Parental unfitness. i.  Standard of review.  Before terminating a parent's rights to a child, a judge must find by clear and convincing evidence that the parent is unfit.  See Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021).  "'[P]arental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'"  Id., quoting Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997).  In making this determination, "the judge 'may consider past conduct to predict future ability and performance.'"  Adoption of Jacob, supra, quoting Adoption of Katharine, supra at 32-33.  "When making this determination, subsidiary findings of fact must be supported by a preponderance of the evidence, with the ultimate determination of unfitness based upon clear and convincing evidence."  Adoption of Rhona, 63 Mass. App. Ct. 117, 124 (2005).  Our review is for an abuse of discretion or clear error of law.  See Adoption of Elena, 446 Mass. 24, 30 (2006).

ii.  Father's domestic violence.  We are not persuaded by the father's argument that the Department of Children and Families (department) failed to show a basis for its ongoing concerns about his domestic violence and likewise failed to show a nexus between his history of domestic violence and his ability

2

to parent Erik and Luke.  Here, the judge made "detailed and comprehensive findings on domestic violence" by the father towards both Zygmunt and the mother.  Adoption of Jacob, 99 Mass. App. Ct. at 262, quoting Care & Protection of Lillith, 61 Mass. App. Ct. 132, 139 (2004).  The judge found that on at least two occasions -- one in 2018 and another in 2019 -- the father used physical violence to discipline Zygmunt.[4]  In the first incident, while the family was living in Colorado, the father hit Zygmunt in the face, giving him a black eye and leading the mother to send Zygmunt to live with family friends in Massachusetts based on her concerns about "the unhealthy and unsafe environment in the . . . home."[5]  In the second incident, which occurred while the family was living together in Massachusetts, Zygmunt was hospitalized after the father grabbed him by the neck and repeatedly punched him in the face and abdomen.[6]  At the termination trial, both parents testified that Zygmunt was at fault for the altercations with the father.  The judge did not credit that testimony.  The mother, too, was a

---

[4] Zygmunt has a learning disability and has been diagnosed with attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and anxiety.  Additionally, as we discuss below, Zygmunt's communication skills differ from those of the parents, Erik, and Luke, all of whom experience some level of hearing impairment.

[5] Although the father testified that the incident was an accident, the judge did not credit that testimony.

[6] The father was prosecuted for this abuse and pleaded guilty to charges of assault and battery on Zygmunt.

3

victim of the father's domestic violence; the judge found that the father "frequently" forced the mother to have sex with him.[7, 8]

Additionally, the fact that the father pleaded guilty to assault and battery of Zygmunt and "accepted" court-ordered punishment does not render erroneous the judge's findings that the father neither accepted responsibility for his actions nor benefited from the available treatment. Despite the father's having pleaded guilty to the criminal charges, the judge found that the father continued to blame Zygmunt for initiating the disputes between the two of them. Additionally, the judge's findings reflect that although the father engaged in counselling intended to address his use of physical punishment on the children, he refused to acknowledge that domestic violence applied to children at all and never identified a plan for disciplining the children without physical force. See Adoption

_____

[7] Indeed, the judge implicitly found that the mother's and father's youngest child, Michael, see note 2, supra, was conceived as a result of the father's forced sex with the mother. The father was charged with raping the mother, but the charges were later dismissed at the mother's request.
[8] The father's undeveloped argument about the impact of "outside influences" impeding his ability to meet Zygmunt's needs does not persuade us otherwise. Specifically, the father argues that (1) the friends to whom the mother gave temporary guardianship of Zygmunt after father's abuse required Zygmunt's hospitalization attempted to undermine his relationship with Zygmunt; and (2) the department "did nothing [after the children's removal from the father and mother] to address Father's relationship with Zygmunt."

4

of Ulrich, 94 Mass. App. Ct. 668, 677 (2019), quoting Petitions of the Dep't of Social Servs. To Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) ("The [parent's] inability to consistently attend, complete, and benefit from classes required by [their] service plan is 'relevant to the determination of unfitness'").

Furthermore, the absence of any finding that the father abused Erik and Luke does not, as the father contends, negate the existence of the requisite nexus between the father's domestic violence against the mother and Zygmunt and his ability to parent Erik and Luke. Domestic violence in the home "has a profound impact on children," whether or not the children at issue are themselves direct victims of abuse.[9] Custody of Vaughn, 422 Mass. 590, 599 (1996) See Care & Protection of Lillith, 61 Mass. App. Ct. at 141. Here, the judge made properly supported findings that the father had only inconsistently engaged in services intended to improve his anger management skills and understanding of domestic violence, and failed to benefit from those services in which he did participate. The scarcity of evidence of the father's past

_____

[9] Any argument that Erik and Luke did not witness the domestic violence against the mother and Zygmunt is unpersuasive because "[a] parent's willingness to ignore or minimize abusive behavior can be an indicator of unfitness, regardless of whether the child is at risk of abuse or witnessing abuse." Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018).

5

abuse of other family members did not prohibit the judge from considering the evidence of his abuse of Zygmunt and the mother in assessing the father's fitness as to Erik and Luke. "A judge . . . need not wait for disaster to happen but may rely upon past patterns of parental neglect or misconduct in determining current or future fitness." Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). We discern neither abuse of discretion nor other error in the judge's reliance on evidence of the father's domestic violence in assessing the father's fitness to parent Erik and Luke. See Adoption of Garret, 92 Mass. App. Ct. 664, 673-674 (2018) (judge warranted in concluding parent's failure to benefit from services under department plan rendered parent unfit).

iii. Best interests assessment. For substantially the reasons we have just discussed, we are not persuaded by the father's argument that the judge erred in evaluating his parental fitness and the best interests of Erik and Luke collectively, rather than individually. We acknowledge that "[p]arental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age," Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Mary, 414 Mass. 705, 711 (1993), and to that extent, must be "child-specific."

6

Adoption of Ramona, 61 Mass. App. Ct. 260, 263 (2004).  We recognize that Zygmunt, whom the judge found to have suffered from the defendant's physical abuse at least twice, was on different footing as to the father when compared to his half-brothers, Erik and Luke.  First, Erik and Luke are the father's biological children while Zygmunt is his stepchild.  Second, like the father (and the mother), Erik and Luke are hard of hearing and communicated primarily using American Sign Language (ASL); Zygmunt, by contrast, is a hearing child, who communicates verbally, as well as through ASL.[10]  Third, Zygmunt has been diagnosed with a learning disability, ADHD, PTSD, and anxiety.  Erik and Luke do not experience such issues, but Erik, particularly, has specialized and chronic medical needs.

None of these differences, however, impacted the judge's overarching conclusion that the father was unable to manage his own anger or appreciate the fact or impact of his domestic violence, and thus unfit to parent Erik and Luke or to care for Zygmunt.  This is not a case in which the father's ability to parent depended on the individual needs of each child; rather, it depended on his own ability to care for the children without resorting to physical punishment or exposing them to domestic violence.  Here, where all members of the family were exposed to

---

[10] Although the father argues that Zygmunt "doesn't understand sign language," the record does not support that contention.

7

the risk of physical abuse, we discern no error in the judge's consideration of the three children as a group. See Adoption of Nancy, 443 Mass. 512, 516 (2005) ("Although it would be better practice specifically to state the reasons that termination is in the child's best interest, such specificity is not required").

b. Reasonable efforts. The father's challenge to the department's reasonable efforts to provide services to accommodate the parents' hearing issues was not raised with the department before trial, and so it is waived.[11] See Adoption of West, 97 Mass. App. Ct. 238, 244 (2020). Even if that were not the case, we would not be persuaded that the department's handling of either visitation or the children's placement with preadoptive parents not fluent in ASL, the parents' primary means of communication, warrants reversal. See G. L. c. 119, § 29C ("A determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest"). See also Adoption of Franklin, 99 Mass. App. Ct. 787, 797-798 (2021) (although department clearly violated its own regulations regarding visitation, "it does not follow that the father is

---

[11] The same is true for the father's argument based on the agreement between the Department of Justice and the department or the department's subsequent issuance of Disability Policy #2022-01.

8

entitled to reversal of the decrees terminating his parental rights").

   i. Visitation. After the children were removed from the parents' custody in early March 2019, the mother was offered regular in-person visits with the children. In late August 2019, when she moved to Indiana with the father, her visits were decreased to monthly. By contrast, the father was denied visitation with Erik and Luke until August 2019 for reasons that were "unclear" to the judge; however, once the parents moved to Indiana, he was also permitted monthly visits with his children.[12] Later, the department incorrectly restricted the parents to virtual visits despite an easing of the COVID-19 protocols for in-person visits. Still, although we recognize some significant missteps in the department's handling of the parents' visitation opportunities, we are not persuaded that these missteps warrant reversal because the key to the family's reunification was not improvements in the parents' ability to communicate or bond with the children, but rather the parents' ability to recognize and eliminate the risk to the children

---

[12] We agree with the father that the denial of visitation was in violation of 110 Code Mass. Regs. § 7.128 (2008), which requires that the matter be brought before a judge before parental visits are terminated, and that the judge make "specific findings demonstrating that parental visits will harm the child or the public welfare."

created by the father's domestic violence.[13, 14]  See Adoption of
Franklin, 99 Mass. App. Ct. at 798 ("To address whether
[reversal] is appropriate, we need to examine the grounds on
which the judge determined the father to be unfit and terminated
his parental rights, and what role, if any, the absence of
visitation . . . played in those decisions").

    ii.  Preadoptive placements.  We are likewise unpersuaded
that by placing the children with foster families who were not
fluent in ASL, the department "actively engineered the breakdown
of the parental relationship" between the father and Erik and
Luke.  Although Luke's foster mother is not fluent in ASL, she
does have some training and was taking additional sign language
training at the time of trial, and she used both ASL and verbal
speech with Luke.  Additionally, Luke's foster mother advocated
for him to be enrolled in the READS Academy hard of hearing

_____

[13] This is not to say that we condone the department's failure to
follow its own policies, or that we have ignored the particular
impact of physical separation between these parents and these
children where the family communicated primarily by nonverbal
means.  Our conclusion is only that to the extent that the
department erred in depriving the family of in-person visits,
the error did not go to the heart of the judge's concerns about
the parents' unfitness.
[14] At the time of trial, the father had not completed the
domestic violence classes required as part of the department's
action plans.  The judge found that "[the father] justified his
non-compliance because [Zygmunt] is a child and domestic
violence is between adults."  Likewise, he had not engaged in
anger management services and had not completed a batterer's
intervention program.

preschool program where he was learning ASL. Erik, on the other hand, wears hearing aids and was receiving speech and occupational therapy in school; it is unclear from the record whether Erik's foster parents understand or use ASL with him regularly.[15] In other words, where the foster families pursued ASL services and exposed each child to ASL relative to that child's individual language needs, even where the parents do not feel the services were adequate, we are not persuaded that the department violated the parents' rights.

Furthermore, even if we were to conclude that the placements were not conducive to, or even barriers to, the department's stated goal of reunification, we are satisfied that the judge correctly determined that termination of the father's parental rights was in the best interests of Erik and Luke. See Adoption of Ilona, 459 Mass. 53, 61 (2011). As the judge found, the root of the father's unfitness was his inability to acknowledge and appreciate the impact of his domestic violence on the children's well-being, not challenges in communicating with them. See Adoption of Franklin, 99 Mass. App. Ct. at 799.

2. Mother's appeal. a. Parental unfitness. i. Failure to protect children from father. We do not agree with the mother's contention that the judge's finding no. 223 -- "the

---

[15] When Erik arrived at the foster home, the foster parents used "baby" signs to communicate with him.

11

mother's plan to protect the children from [the father] should reunification occur [is] insufficient, leaving all three children at grievous risk [of becoming] a victim of and/or exposed to domestic violence" -- was clearly erroneous. The evidence at trial supported the judge's findings by at least a fair preponderance of the evidence, see Adoption of Xarina, 93 Mass. App. Ct. 800, 802 (2018), that the father abused both Zygmunt and the mother herself, and that the mother was aware that the father posed a risk to all of the children in the home. In late 2018 the mother was sufficiently concerned about the risk of ongoing harm to Zygmunt that she sent him to live with temporary guardians in Massachusetts. The following year, the mother told the department that "she didn't want [the father] to [see] the kids again until he had calmed down so that he would not hurt them."

Despite the mother's evident awareness of the danger the father posed to the family, the judge's findings support the conclusion that she consistently denied or minimized that risk, blaming Zygmunt and his "lies" for the father's criminal prosecution and characterizing the father's forcing her to have sex as a "miscommunication." Although she was made aware of the department's concern for her safety and that of the children, and offered services and education on domestic violence and appropriate parenting, the mother did not take full advantage of

the services offered and did not benefit from those she engaged in. The judge found that "[the mother] demonstrates little awareness and appreciation for the domestic violence of [the father] [toward] herself and the children" and that as a result, the family "remain[ed] at risk for violence in the home." Further, the mother signaled her intention to stay with the father notwithstanding his violence toward her and Zygmunt. In February 2020, just after the father's charges for abusing Zygmunt were resolved, the mother married the father. The judge found that the mother viewed the father as "the only person that she had in her life" and that she intended to stay with him.[16] The mother does not challenge any of these findings as clearly erroneous.

We are not persuaded that the evidence of the father's domestic violence and anger management issues was stale, see Adoption of Diane, 400 Mass. 196, 204 (1987); we likewise consider it sufficiently detailed to support the judge's subsidiary findings concerning the mother's ability to protect

---

[16] Tellingly, the father does not challenge the judge's findings that although the mother testified that she did not want the father to supervise Zygmunt "because she wants Zygmunt to be safe and not to be hurt again," and her safety plan for the family included taking the children to a friend's house when the father became angry "until such time as [the father] regained self-control and it was safe to return home," the mother's plan for childcare while she was at work would have left the children in the father's care. Again, the mother does not dispute these findings.

13

the children from the father's violence. See Custody of Vaughn, 422 Mass. App. Ct. at 599-600 (requiring courts to make explicit findings as to effect of domestic violence on child"). See also Adoption of Elena, 446 Mass. at 31-32 ("There was ample evidence that the children would suffer if returned to the custody of their mother" where "[t]he mother was unable to stand up to her abusers when the abuse was directed at her, and she was ineffectual at intervening on behalf of her children when the abuse was directed at them"). The mother's inability or unwillingness to extricate herself from the father despite his history of abusing both Zygmunt and her was relevant to the mother's ability to protect the subject children from grievous harm. See Adoption of Lisette, 93 Mass. App. Ct. 284, 293-294 (2018). The fact that the judge did not find that Erik or Luke had been the direct victims of abuse is, as we have discussed, not a basis on which to vacate the decrees. See id. at 294 n.15; Adoption of Katharine, 42 Mass. App. Ct. at 32-33 (judges need not "wait for inevitable disaster to happen" and "may consider past conduct to predict future ability and performance").

ii. Mother's parenting of Michael. In 2019, shortly after the mother and the father moved to Indiana, the mother gave birth to Michael, their third child together. The mother's argument that the judge abused his discretion by failing to

14

consider her success in caring for Michael, is unavailing. Although Michael lived in Indiana with the parents, and was not a party to this action, the judge did consider the limited evidence about the mother's ability to care for him. The judge noted that Indiana child protective services had been involved with Michael and the parents after Michael's birth and that custody of Michael had remained with the parents. The judge also took into account the testimony of Michael's aunt indicating that she had never seen the parents "be physical" in disciplining him. Notably, however, the mother testified and the judge found that although the mother sometimes felt it necessary to leave her own house when the father became angry "until . . . it was safe to return home," she would only sometimes take Michael with her; at other times, despite her safety concerns, she left the sleeping Michael with the angry father. We are satisfied that the judge considered the limited evidence of the mother's fitness to care for Michael in reaching his conclusion about her unfitness to care for Zygmunt, Erik, and Luke. Cf. Adoption of Linus, 73 Mass. App. Ct. 815, 820-821 (2009).

iii. Visitation. The mother did not raise her concerns about limited visitation in the trial court. Although the issue is therefore waived, we nonetheless address it. See Adoption of West, 97 Mass. App. Ct. at 244-245. We have noted our concerns

15

about the department's failure to provide the parents with the opportunity for in-person visits at the earliest opportunity. As we have discussed, supra, however, where the judge's primary concern in this case was the parents' inability to appreciate the impact of the father's domestic violence on the family, or the risk to all the children presented by the father's inability to manage his anger, the limits imposed on the parents' opportunity to interact with the children did not, in our view, contribute to the judge's determination of the parents' unfitness. See Adoption of Franklin, 99 Mass. App. Ct. at 797-798. Specifically, as to the mother, we discern no basis to conclude that in-person contact with the three children would have raised the mother's awareness of the risks presented by the father's violence or prompted her to take additional steps to protect the children from those risks. Indeed, the fact that she continued to leave Michael with the father even when she felt her own safety was threatened underscores the point.

iv. Child-specific fitness determinations. For essentially the reasons we have discussed in connection with the father's appeal, we are unpersuaded that the judge abused his discretion in failing to consider separately the mother's fitness to parent each of the three children. The key elements of the mother's unfitness here -- her inability to appreciate the risks presented to all family members by the father's

16

violence and her unwillingness or inability to protect the children from those risks -- do not vary with the needs or abilities of the individual children.  The judge implicitly found that the father was a risk to all three children, and that the mother's failure to acknowledge the impact of the father's domestic violence prevented her from adequately protecting any of the children.  We discern no abuse of discretion in the judge's conclusions.

Decrees affirmed.

By the Court (Vuono, Milkey & Hand, JJ.[17]),

Assistant Clerk

Entered:  February 9, 2024.

---

[17] The panelists are listed in order of seniority.