NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1420

ADOPTION OF ZENDAYA.


MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and father appeal from decrees of a Juvenile Court judge finding the mother and the father unfit to parent their daughter, Zendaya,[1] and terminating their parental rights. The father also argues that the judge erred in not granting him postadoption visitation with the child.  We affirm.

Background.  We summarize the facts as they were found by the trial judge.  The Department of Children and Families (department) have been involved with the family since Zendaya was born in August 2019, substance exposed to suboxone and norepinephrine.

The mother has not adequately or consistently engaged in services to better her parenting skills.  She has a substance

_____

[1] A pseudonym.

misuse history and has demonstrated a pattern of relapsing, engaging in some services, only to stop engaging in the services or relapse again.  The mother did not consistently engage in individual therapy or psychiatric services.  She has a lack of insight into her parental shortcomings and mental health.  Throughout the entirety of the case, the mother has never been able to maintain stability in her housing and at times has been homeless.

The father has a significant criminal history.  He does not have stable housing or employment.  The father has not engaged in therapy and has failed to work with the department or consistently engage in any services.  The father has not undergone an evaluation to assess his mental health needs.

The mother and the father have a history of domestic violence.  Over the course of their relationship, the mother and the father have engaged in serious verbal and physical altercations, requiring police intervention on numerous occasions.  The mother has persisted in her relationship with the father despite her acknowledgment of ongoing domestic violence.  The mother has obtained restraining orders against the father but each time has allowed them to expire or has violated the restraining order.  The mother has demonstrated an inability to stay away from the father for more than a few weeks at a time.  The father has not engaged in domestic violence

2

services and adamantly denies any violence in his relationship with the mother.

Discussion. 1. Unfitness and termination of parental rights. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between the parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). "While a decision of unfitness must be supported by clear and convincing evidence, . . . a judge's findings will be disturbed only if they are clearly erroneous" (citations omitted). Adoption of Paula, 420 Mass. 716, 729 (1995). Whether termination of parental rights is in a child's best interest is a discretionary decision. See Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied, 526 U.S. 1034 (1999). We review the judge's determination of Zendaya's best interest for abuse of discretion or clear error of law. See id. We discern no error or abuse of discretion in the judge's conclusions, discussed supra, that the mother and father were unfit to parent Zendaya and that their unfitness was likely to continue indefinitely.

The judge's finding of the mother and father's substance misuse was wholly supported by the record. Substance abuse is a factor to be assessed in considering a parent's unfitness to the

3

extent that it prevents a parent from providing "minimally acceptable care" to a child. G. L. c. 210, § 3(c)(xii); Adoption of Zoltan, 71 Mass. App. Ct. 185, 191 (2008). The mother's substance misuse began in 2005. Her appearance and behavior from 2021 to 2022 suggested that she was under the influence of substances. The mother's participation in treatment was minimal. In February 2021, the mother was observed under the influence and outside "for extended periods of time" with Zendaya who was "underdressed for the weather." The father began using cocaine in approximately 2000 at the age of twenty-two and over the years has become addicted to Percocet and heroin. Although the father denied it, his lengthy criminal history includes drug charges.

The father argues that the judge erred by relying on stale information to support his conclusion that domestic violence remained an ongoing problem for the parents. Family violence is "highly relevant to a judge's determination of parental unfitness and the best interests of the child[]." Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005). "[P]hysical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm." Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Custody of Vaughn, 422 Mass. 590, 595 (1996).

4

This court has clarified that a parent's improvements in addressing domestic violence do "not preclude consideration of past behavior as a means of predicting the likely future." Care & Protection of Olga, 57 Mass. App. Ct. 821, 830 (2003).

Over the course of their relationship, both parents have engaged in serious verbal and physical altercations and many of them have resulted in police involvement. The mother and father's history of domestic violence, and the persistence in seeing each other despite their tumultuous relationship were amply supported by the record. Some of the incidents between the mother and the father occurred several years ago and others are more recent, causing mother to enter a domestic violence shelter in August 2022, several months before the trial. The record also demonstrates the parents' inability to understand the effects of domestic violence on Zendaya and their failure to benefit from programs associated with domestic violence.

The father denied any domestic violence in the family. See Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018) ("A parent's willingness to ignore or minimize abusive behavior can be an indicator of unfitness, regardless of whether the child is at risk of abuse or witnessing abuse"). The father's failure to acknowledge and fully address his issues of domestic violence was relevant to and supports the finding of unfitness. See Adoption of Carla, 416 Mass. 510, 519-520 (1993). We discern no

5

abuse of discretion in the judge's determination that despite the father's participation in services available to him to learn about domestic violence, his failure to benefit from those services left him unfit to parent the children. The judge is permitted to consider failure to engage in services to support an unfitness finding. Adoption of Willow, 433 Mass. 636, 645 (2001).

The father also argues that the judge did not adequately establish a nexus between parents' domestic violence and the father's fitness. The judge, however, after outlining numerous violence incidents between the parents, concluded that returning "custody of the child to either or both parents would place the child at grievous risk of exposure to domestic violence" which would harm the child's physical and emotional well-being. "[N]either agencies responsible for the welfare of children nor judges sitting on these sorts of custodial questions need to wait for inevitable disaster to happen." Adoption of Katharine, 42 Mass. App. Ct. 25, 32 (1997).

The judge made "specific and detailed findings" supporting the conclusion that the mother and father were unfit to parent Zendaya and that their unfitness was not temporary.[2] Adoption of

---

[2] The father argues that since he had been given physical custody of his son the court must point to specific evidence as to why he could be fit to parent his son but not Zendaya. See Adoption of Rhona, 57 Mass. App. Ct. 479, 487 (2003). We see no

6

Quentin, 424 Mass. 882, 888 (1997). See Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018) (judge must "find that the current parental unfitness is not a temporary condition"). The judge properly considered that the mother had engaged in few action plan tasks and services while she continued to engage in the same unstable and violent behaviors, while father engaged minimally in his action plan tasks or services. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) ("mere participation in the services does not render a parent fit without evidence of appreciable improvement in her ability to meet the needs of the child[]" [quotation and citation omitted]). The mother has had violent and emotional outbursts and has bitten her son on more than one occasion. "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60. The judge considered the mother's efforts to engage in services, separate herself from the father by moving to a different state, and stabilize her housing situation by moving from a shelter

---

merit to this argument where his son was still in the custody of the department and because he had turned eighteen during the pendency of this care and protection, the judge made no findings as to the fitness of the father in regard to his son.

7

into a home, but concluded that mother's engagement in services was "inconsistent at best," and that the time mother had spent away from father in the months leading up to trial was "not enough time to convince this Court that Mother has successfully distanced herself from Father." As for the mother's housing stability, the judge found that she had not established stable housing at the time of trial. Although mother did live in an apartment, she had not yet lived there long enough to demonstrate a deviation from her previous inability "to maintain an apartment for more than a few months."

The mother takes issue with the judge's finding that the department's goal for Zendaya is adoption by her current foster placement. She argues that this finding is clearly erroneous because the adoption plan instead indicates that the department's first placement choice is with Zendaya's maternal grandmother. While the mother is correct that the grandmother volunteered as a placement option, the judge explained in his findings that the grandmother was considered for placement, but because she currently lives in New Hampshire, an Interstate Compact on the Placement of Children (ICPC) process must be completed before Zendaya could be placed at the grandmother's home. A prior ICPC had been denied with regard to placement of Zendaya's brother because the grandmother said she could not do the required classes. The record does not reflect that the

8

grandmother's circumstances have changed.  These obstacles are not present with Zendaya's current foster placement.  There was sufficient support in the record for the judge to find that the department's goal was adoption by Zendaya's current foster placement.

The mother also argues that the child's position at trial was that termination was not in her best interests and that should have been "weighted heavily."  The child, however, has not appealed.  Moreover, although a child's wishes are entitled to weight, they "are neither decisive nor outcome dispositive . . . and must be considered against the backdrop of the [parents'] unfitness."  Care and Protection of Vick, 89 Mass. App. Ct. 704, 710 (2016).  The judge did not abuse his discretion.

The father argues that the judge erred by finding that the father "has failed to . . . engage in any services whatsoever" when he participated in about ten weeks of an online domestic violence class, but did not finish the program.  While the judge could have used more precise language, we interpret this conclusion to mean that he considered father's limited participation in programming to be insignificant to the extent that he gave it no weight in his broader analysis of the father's fitness.  A lack of precision in the judge's findings

does not itself warrant disturbing the judgment.  See Custody of Zia, 50 Mass. App. Ct. 237, 245 (2000).[3]

The father also argues that because his action plan tasks were not sufficiently connected to the alleged deficiencies in his parenting abilities, the judge should not have taken into account his failure to complete certain tasks that the father argues were not relevant to his deficiencies.  In particular, he argues that the judge's finding that he did not engage in individual therapy should not have counted against him because the department has not established any issue with the father's mental health.  Treatment of a mental health disorder, however, is not therapy's only function.  In the father's case, the judge's findings establish that the department tasked father with engaging in therapy to "focus on de-escalation strategies as well as insight to his behaviors and how they can negatively affect his children."  This task was relevant to the father's history of domestic violence and its effect on his children and his failure to comply with it supported the judge's finding.

2.  Postadoption visitation with the father.  The power to order postadoption contact rests within the discretion of the

_____

[3] The father similarly disputes the judge's finding that he lacked stable housing because he stayed at a friend's house in the months leading up to and during trial.  The judge acted within his discretion in not finding these accommodations to constitute stable housing.

10

trial judge, who may determine the extent to which decisions regarding visitation are left to the judgment of the adoptive family. See Adoption of Rico, 453 Mass. 749, 753-754 (2009). We review a judge's decision not to order postadoption visitation with a parent for abuse of discretion. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 623-624 (2021). Before mandating an order of postadoption contact between a child and parent whose rights have been terminated, a judge must find both that visitation would be in the child's best interests and that those interests will not be adequately served by the preadoptive or adoptive parent's discretion. See Adoption of Cadence, 81 Mass. App. Ct. 162, 168 (2012). The judge must weigh any "intrusion that an order imposes on the rights of the adoptive parents, who are entitled to the presumption that they will act in their child's best interest." Adoption of Ilona, 459 Mass. at 64-65. An order of postadoption contact is more likely in circumstances where the primary "parent-child relationship in the child's life remains with the biological parent" and other adults have not fully assumed that role. Adoption of Vito, 431 Mass. 550, 564 (2000).

Zendaya has remained in the department's custody since 2021 when she was less than two years old. She has resided in the same home since that time. Zendaya has been doing well and is up to date medically and with her immunizations. Zendaya has a

great relationship with her foster parents.  When visitation was available to the parents, their attendance was inconsistent.  The judge acted well within in his discretion in not ordering postadoptive visitation.

3.  Sibling visitation.  The father alleges that the judge erred by failing to issue orders of post adoption visitation between Zendaya and her brother.  If siblings are separated through adoption, a judge "shall whenever reasonable and practical and based upon the best interests of the child, ensure that children . . . shall have access to and visitation rights with . . . siblings."  G. L. c. 119, 26B (b).  The statutory "provisions reflect a legislative determination that the judge must decide whether and, if so, how sibling visitation is to occur, . . . [and] also the schedule and conditions of visitation."  Adoption of Rico, 72 Mass. App. Ct. 214, 220-221 (2008), S.C. Adoption of Rico, 453 Mass. 749.  See Adoption of Flavia, 104 Mass. App. Ct. 40, 56-57 (2024).

Putting aside the question whether the father continued to have standing to seek sibling visitation once his parental rights were terminated, see Adoption of Zander, 83 Mass. App. Ct. 363, 367 n.6 (2013), where the judge did not make a finding that sibling visitation was in the children's best interests,

12

there is no obligation to order such contact.[4]  See generally

Care & Protection of Jamison, 467 Mass. 269, 284 (2014) ("the

'best interests of the child' standard does not establish a

presumption in favor of sibling visitation").  In these

circumstances, we discern no error in the judge's failure to

make a sibling visitation schedule.

If Zendaya is dissatisfied with not having visitation with

her brother, she can file a motion pursuant to G. L. c. 119,

§ 26B (b) and thereafter if the judge finds it is in the best

interests of Zendaya, then the judge must specify in an order or

orders the form and schedule of such visitation.  See Adoption

---

[4] Unlike Adoption of Zander, 83 Mass. App. Ct. 363, 367 (2013), where "[t]he judge acknowledged the necessity of sibling visitation, but left the timing and frequency of such visits to the discretion of the adoptive parents," and this court "remand[ed] for the judge to provide a schedule for posttermination and postadoption sibling visitation," the judge here does not appear to have been asked to (and did not) make findings as to whether such visitation was in the children's best interests.

of Rico, 453 Mass. at 754 n. 12; Adoption of Flavia, 104 Mass. App. Ct. at 57.

Decrees affirmed.

By the Court (Singh, Hand & D'Angelo, JJ.[5]),

Paul Little

Clerk

Entered:  August 14, 2024.

---

[5] The panelists are listed in order of seniority.